405 So.2d 1350 (1981)
Johnny Tyrone McCauley, Appellant,
v.
STATE of Florida, Appellee.
Nos. 80-1200, 80-1332.
District Court of Appeal of Florida, Fifth District.
November 18, 1981.
*1351 James B. Gibson, Public Defender, and Thomas R. Mott, Asst. Public Defender, Daytona Beach, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and C. Michael Barnette, Asst. Atty. Gen., Daytona Beach, for appellee.
PER CURIAM.
Appellant McCauley was charged and convicted of second degree murder. The only issue requiring discussion is whether the trial court erred in denying appellant's motion for judgment of acquittal at the conclusion of the State's case. We have carefully considered the record and find that the evidence at the close of the State's case was reasonably susceptible of two different views: that the appellant's action in shooting the deceased was justifiable self-defense or that such action evinced a depraved mind without proper regard for the life of the deceased. Therefore the trial judge properly submitted the case to the jury who determined the disputed question of fact against the appellant.
AFFIRMED.
ORFINGER and COWART, JJ., concur.
COWART, J., concurs specially with opinion.
COBB, J., dissents with opinion.
COWART, Judge, concurring specially:

"In law, what plea so tainted and corrupt but, being seasoned with a gracious voice, Obscures the show of evil?"
Shakespeare, Merchant of Venice, Act. III, Scene II, Line 74.
McCauley was charged with second degree murder, defined as killing another "by any act imminently dangerous to another and evincing a depraved mind regardless of human life." § 782.04(2), Fla. Stat. (1979). The dissent would hold that the State did not establish "Johnny Boy" McCauley's "depraved mind" at the time of the shooting beyond a reasonable doubt or, alternatively, that self-defense as a matter of law was established in the State's case.
For all the frills the basic facts are an old story: Two men and one woman; Skit had her first and Johnny Boy beat his time with her. Trouble and threats. Johnny Boy carried his pistol to a party. Skit wanted to talk to Debbie, but Debbie didn't want to talk to Skit anymore. Johnny Boy "walked around the car to where Skit was."[1] They had "words" and, suddenly and without warning, Johnny Boy shot Skit dead in the head. Of course, Debbie and her girl friend Josa view the facts favorable to Johnny Boy. They all now believe Skit was "reaching," but Skit was not reaching  he had nothing to reach for  he was unarmed. He cannot testify, but the facts themselves speak.
The jury's task was to determine whether Johnny Boy's act in killing Skit evinced an evil and morally debased (corrupt), hence depraved, mind. In doing so, as with any question of fact, the jury had a right to, and apparently did, disbelieve and disregard McCauley's testimony that he thought Skit was "reaching." There was sufficient other evidence, including evidence of McCauley's *1352 ill feelings toward Skit and his preparation for the encounter, from which the jury could properly find McCauley guilty of second degree murder.[2]
McCauley's self-defense claim was likewise properly submitted to the jury. Self-defense is an affirmative defense[3] and the State has no burden to anticipate and negative it in its case in chief. Involving as it does intricate finding of facts and numerous conclusions,[4] the question of self-defense, with its inherent problems involving judgment and credibility decisions based on common sense and experience and the weighing of evidence, is peculiarly a function of the jury. The dissent cites no Florida case,[5] and research reveals none, where an appellate court has analyzed and weighed the facts and circumstances, overruled a jury determination to the contrary, and held that the facts constituted self-defense as a matter of law. To put Johnny Boy back on the street would require a deviation from well established law and would create a most remarkable and dangerous precedent. In criminal cases trial courts routinely acquit for insufficiency of evidence but it is quite another thing to acquit for a sufficiency of evidence as to an affirmative defense because under such a practice when the trial court errs in favor of the accused the State has no appeal and an anxious citizenry is deprived of its right, as a jury, to express a community attitude toward the reckless, irresponsible and lawless use of a handgun when it is urged as a defense to a criminal act.
The real issue was the state of mind of Johnny Boy when he pulled the trigger. Under all the circumstances did his act which killed Skit evince an evil and morally debased (depraved) mind, or did he truly act out of an innocent, unavoidable and forced necessity and, therefore, in self-defense? The jury, as is their duty and function, answered that question. The dissent is so engrossed and enthralled with the colorful details and life styles that it would overrule the jury and hold, as a matter of law, that the jury erred in determining the ultimate facts, including the state of mind of the accused. There was sufficient evidence on all issues to justify their submission to the jury and this appellate court should not now hold, as a matter of law, that the jury erred in its determination or that the trial court erred in permitting the jury to weigh the facts and circumstances in the case and answer this question.
COBB, Judge, dissenting.
I dissent.
The defendant, Johnny Tyrone McCauley, was arrested on October 22, 1979, as the result of shooting and killing one William "Skit" Johnson shortly after midnight on that date. The state filed an information charging that McCauley "did, in violation of Florida Statute 782.04, by an act imminently dangerous to another, and evincing a depraved mind regardless of human life, ... murder William Johnson by shooting (him) with a handgun."
*1353 McCauley was convicted as charged after jury trial and appeals that judgment and sentence. The question we consider is whether the trial court erred in denying the defendant's motion for judgment of acquittal at the conclusion of the state's case.
In his opening statement, the prosecutor said:
I believe there will be testimony in this courtroom to the effect that just prior to the shooting of Skit Johnson that he reached behind his back, and I believe in the statement that Johnny McCauley made to the police, you're going to hear it was Johnny McCauley's belief that Skit had a gun or weapon of some sort, and that he was acting in self defense when he killed Skit Johnson.
The prosecutor knew this in advance because, as it turned out, that was the uncontroverted testimony of the state's witnesses to the shooting. As the prosecutor told the jury, "Josa Sanchez and Debbie Donaldson are the only ones (other than the defendant) that really had an opportunity up close to see what occurred."
The state then called these two eyewitnesses, together with ten other witnesses, to establish various elements of proof, and read McCauley's statement. The state then rested, and the defense moved for acquittal. As it weighed that motion, the trial court had before it the following evidence:

I. THE TESTIMONY OF DEBBIE DONALDSON
Debbie Donaldson testified that she had met Johnson and had a sexual relationship with him in the Fall of 1978. Soon after Debbie first met Skit, he shot at her then boyfriend, whose name was Victor, at her father's house. Later, he threatened her with a large handgun in Tampa. In early 1979 she transferred her affections to McCauley. Although Johnson and McCauley previously had been friends, by August, 1979, Skit had developed a hatred for McCauley and told Debbie not to see him. In late August, 1979, Skit beat Debbie and threatened to "mess up her face" if she continued to be friends with Johnny, who was "no good." These threats were conveyed to Johnny by Debbie and her sister.[1]
Between the first altercation in August and the shooting in October, Debbie called the police four or five times a week because of Skit's harassment,[2] manifested by uninvited visits to her house and repeated threats to mess up her face and to kill Johnny. During the course of Skit's numerous threats of physical damage to Debbie and death to McCauley, Skit repeatedly boasted to Debbie that he had been a trained killer in the service. Some of these threats were in the presence of Debbie's sister, Lee Price. Some two to three weeks before the fatal shooting, Debbie saw Skit carrying a gun at a party and at that time he said he wanted to kill Johnny. Debbie told Johnny McCauley several times of Skit's threats to kill him.
On the night of October 8th, Skit came to Debbie's house and broke her window by striking it with a pistol. Two police officers were called to the scene, and while they were there a telephone conversation ensued between Debbie and Johnny, who were on phones in her house, and Skit, who was calling from an outside phone. One of the police officers was on another extension in the house. During this conversation, Skit told Johnny that he had his "piece" and Johnny had his "piece" so they should "meet somewhere and get it over with." Skit said he was at a Texaco station and invited McCauley to meet him there and settle it. McCauley, instead, offered to fight Skit "fair," which Debbie understood to mean with bare hands.
On the evening in question, Donaldson got to the party on Ivy Lane about 11:00 *1354 P.M. with her friend, Josa Sanchez. She had no plans to meet either Johnson or McCauley at the party. She danced with McCauley and observed him carrying a leather bag, which he had with him every time she saw him. Previously, she had seen inside the bag and saw a leather pouch containing a wallet. When the party was over and she walked outside, she encountered Skit who approached her and wanted to talk to her. She declined, and Skit grabbed her and shook her. He previously had "thrown me around and broke out my window at my house," according to Donaldson. Skit then walked down Ivy Lane to where Debbie's car was parked ahead of her. She observed no weapon on him. He was wearing a tee shirt and slacks. Debbie asked Josa to leave with her, but Josa hung back because of Skit. When Debbie reached the driver's side of the car, where Skit was waiting, he proceeded to sling her around. He stated he was going to kill Johnny. She did not think Johnny heard this threat. Johnny and Josa, who followed a short distance behind Debbie and close enough to hear a man's speaking voice, walked up to the passenger side of the car; Josa told Skit to leave Debbie alone, but he continued pushing her around. Johnny told Skit to leave her alone, and walked around the car to where Skit was, and they "said words back and forth." At this time, Debbie could not see McCauley's hands. Debbie began to get in the open door of her car. She heard Skit say, "You don't have anything to do with this," and, as he said this, she saw him reach for his back pocket. Then she heard the shot. She then saw Skit fall to the ground.
The words Debbie heard McCauley say to Johnson immediately prior to the shooting were: "Why don't you leave her alone? You know she doesn't want to talk to you." Whereupon, Skit said, "You don't have anything to do with this," and reached behind his back. Debbie did not see the gun, either before or after the shooting. Debbie screamed and jumped up out of the car. Johnny walked around the car, got in the passenger's side, and told her to get in and take him to the police station.
After the shooting, Johnny got in Debbie's car and told her they were going to the police station, and for her to tell the truth. She drove the car back to the yard where the party had been going on. Johnny got out to get Josa, who had run back to the party, then the three of them drove to the police station. Johnny told them to tell the truth. Debbie testified that she had never heard McCauley express any hostility toward Johnson.

II. THE TESTIMONY OF JOSA SANCHEZ
Josa Sanchez knew McCauley and Johnson casually. She was a good friend of Debbie Donaldson, with whom she attended the Sunday night party at the house on Ivy Lane. She was seven and one-half months pregnant at the time. Josa was afraid of Skit Johnson because of his constant harassment of Debbie during the preceding months before the shooting. From what Debbie had been telling her, Josa was concerned that Skit was going to kill Debbie or Johnny or both.
Johnny McCauley and Skit Johnson were both at the party. McCauley was carrying a brown pouch. Johnson was wearing jeans with a jersey which hung over the outside. As they were getting ready to leave she saw Skit grab Debbie by the arm outside the house and try to talk to her, heard Debbie tell him to leave her alone, and saw Skit walk down the road toward the car. Josa was afraid to walk to the car with Debbie because of the way Skit was acting. Josa thereupon asked Johnny McCauley to walk to the car with her. They followed Debbie down the road about five to ten feet behind her, and at that time McCauley was carrying his brown bag.
The location where the car was parked was dark, although there were some street lights "around there." At the car, Johnson grabbed Debbie on the driver's side of the car, and began pushing her up against the car. McCauley had walked to the passenger's side and opened the door for Josa, but she stopped short of the car to see what was *1355 going to happen. Josa started telling Johnson to leave Debbie alone. Then she heard McCauley say, "Won't you let them go home? The ladies don't want to talk to you tonight. Let them go home and maybe talk to you tomorrow."
Johnson replied: "You don't have nothing to do with this." He was still pushing Debbie against the car, and she was screaming and crying for him to leave her alone.
Johnny McCauley came around the back of the car and stood in front of Skit. Skit turned and went for his pocket. Josa turned and ran, hearing a shot after the first two steps, which she estimated covered some five to ten feet. The reason she turned and ran when she saw Johnson reach for his back pocket was: "Because I thought William was reaching for a gun or a weapon or something the way he had been acting. And when, like I was trying to talk to him when he was standing against the car, seemed like nobody could talk to him. He wasn't going to listen to nobody. It was going to be his way or no way. With all that and all the past problems she (Debbie) had, I wasn't taking any chances with my life."
Josa ran until she got back to the party. Then Johnny and Debbie pulled up in the car, he got out carrying the brown bag, and Josa got in. Johnny walked into the crowd. Debbie was crying and Josa tried to console her. Johnny got back in with the brown bag and told them to take him to the police station. She didn't see a gun on either Johnny McCauley or Skit Johnson at any time.

III. OTHER TESTIMONY
The state also presented evidence that after the shooting McCauley handed the gun to another man at the party and told him to take it home. This man subsequently gave the gun to the police. Police officers who investigated the shooting incident testified no weapon was found at the scene or on the body of the decedent. There was also uncontroverted testimony relating to pathology and ballistics to show the McCauley's gun had killed Johnson. Another witness, one Eddie Crayton, who was at the party when the fatal shot was fired, testified that he ran "about a hundred yards" down the road to the scene of the incident and found Skit Johnson lying on the ground. He saw no one touch Johnson, and he saw no weapon in the area around the body.

IV. THE STATEMENT OF McCAULEY
The voluntary statement which McCauley gave to the police approximately one hour and a half after the shooting was read into evidence at the conclusion of the case for the state. In the statement, McCauley revealed the problems he and Debbie had been having with Skit, including the threats and break-ins at her house. His version essentially was the same as that given at trial by Debbie and Josa. McCauley did not know Skit Johnson would be at the party and had no contact or words with him then.
McCauley walked Josa to Debbie's car and was going to ride home with them from the party. At the point he stepped in between Skit and Debbie beside the car, Skit stepped backward a couple of steps, cursing ("you mother so-and-so"), and reached behind his back with his right hand for his pocket. McCauley had his .38 caliber gun in the unzipped leather bag he was carrying. He had been carrying the gun "ever since this (trouble with Skit) happened" and he had told the police about it at the time of the telephone threat. McCauley was "scared of him `cause they say he's shell-shocked or whatever I don't know, but he done told the police and me that he was going to hurt both of us if he ever caught us together." (This also apparently alludes to the telephone threat with the police officer on the extension.) When Johnson reached behind his back, McCauley dropped the bag and shot, aiming at Johnson's head. He could not see Johnson's hand at that point "'cause it was black and I didn't see nothing." McCauley then told Debbie to take him to the police station.
McCauley told the police: "I don't know if he was going to hurt me or not so this might be my fault. I don't know, but I'm *1356 scared of him ... [H]e threatened me three or four times."
The police investigator then asked: "At the time you shot him, or pulled the gun out, what was going on in your mind?"
McCauley answered: "That he was going to shoot me, 'cause he say he was going to shoot me, to kill both of us if he ever see us together."
The investigator then queried: "When did he say that?"
McCauley answered: "He say this for the last three or four weeks. He's been saying it every day. He tells her mama, her father, her family, everybody there. He tells everybody. Everybody at the party knows about it, but my wife, 'cause I don't let her go out. Everybody knows he been saying that, you know, but I don't know if he is going go through with it 'cause I won't let him do none to me. You know, I just hope my mama don't find out, but I just hope he don't hurt me because of her because I'm married."
McCauley did not see a weapon on Skit that night, but thought it could have been concealed under the shirt which was hanging out. McCauley said: "I think at the time it happened that he had one 'cause he always tell us he going to do it." He thought Skit always carried a black .357 magnum, and had seen him previously display it at various places. At another point in his statement, McCauley said: "He (Johnson) flinched like he was going to hurt me so I was going to hurt him before he hurt me, 'cause he had told me two or three weeks ago on the phone that the was going to do this to me, that if he ever catches me he's going to hurt me."
At this point, the state rested, and the trial court was confronted with the defendant's motion for judgment of acquittal.

ARGUMENTS
The state's argument is that it established a prima facie case by showing that McCauley deliberately fired his .38 at Johnson, this being an act imminently dangerous to Johnson and evincing a depraved mind on the part of McCauley. The state relies for this argument primarily upon three cases: Spinkellink v. State, 313 So.2d 666 (Fla. 1975), cert. denied, 428 U.S. 911, 96 S.Ct. 3227, 49 L.Ed.2d 1221 (1976); Edwards v. State, 302 So.2d 479 (Fla. 3d DCA 1974); and Hines v. State, 227 So.2d 334 (Fla. 1st DCA 1969).
In Spinkellink, the issue of self defense was a controverted one: there the state affirmatively produced evidence (1) that the defendant deliberately went into a motel room with a gun to recover money from a victim he knew to be unarmed, after telling a companion he might hear a gunshot; (2) that the defendant had ample opportunity to leave the scene before the confrontation with the victim without risk of harm to anyone; (3) that the fatal shot was fired next to a pillow, raising the inference that the victim was shot while lying down; and (4) there was flight by the defendant after the shooting, which is evidence of guilt. No analogous factors are present in the instant case. Here (1) the victim was clearly the aggressor; (2) there was no opportunity for McCauley to leave the scene, once Johnson had precipitated the confrontation at the car, without the risk of harm to Debbie or to himself; (3) the fatal shot was fired when all of the state's eyewitnesses thought that Johnson was reaching for a deadly weapon, as he had repeatedly threatened to do for more than a month; and (4) there was no flight by McCauley after the shooting.
In Edwards, there was no indication whatsoever that the victim was armed or that he was threatening any harm to the defendant therein at the time he was shot. In Hines, there was no issue of self defense at all; the question was whether or not the fatal shot there was fired as the result of a degree of recklessness that would meet the test prescribed for the statutory offense of second-degree murder. The state presented clear evidence that the defendant Hines deliberately pointed a shotgun at the head of his girlfriend while horsing around after an all-night party, told her to "act like a squirrel" since he wanted to go squirrel *1357 hunting, and caused her death by "stupidly funning around with a dangerous weapon." The appellate court reduced his conviction from first- to second-degree murder.
In the instant case, the state's uncontroverted evidence showed that Johnny McCauley deliberately shot Skit Johnson in the head with a .38. That was an act imminently dangerous to Johnson. But was there evidence that this evinced a depraved mind on the part of McCauley? The proof of this, if such there was, necessarily was circumstantial. But where proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. McArthur v. State, 351 So.2d 972 (Fla. 1977); Davis v. State, 90 So.2d 629 (Fla. 1956); Mayo v. State, 71 So.2d 899 (Fla. 1954). In the instant case, the most reasonable hypothesis under the facts adduced by the state was that Skit Johnson was going for his .357 magnum when McCauley shot first. Indeed, this is what both of the state's independent eyewitnesses thought according to their consistent and uncontroverted trial testimony.[3] Factual evidence that is uncontroverted and undiscredited, where it is not inherently incredible, cannot be wholly disregarded or arbitrarily rejected. Brannen v. State, 94 Fla. 656, 114 So. 429 (1927). In order to convict McCauley of second-degree murder under the facts adduced by the state in its case in chief, this rule had to be abrogated by the trial jury. Hence, it was error by the trial judge to deny the motion for judgment of acquittal.
Although such a test is unnecessary to my conclusion, it is accurate to say that the state in its case presented evidence establishing beyond and to the exclusion of reasonable doubt that the acts of Johnson, coupled with his threats, induced in McCauley at the time of the shooting a reasonable, honest and actual belief of imminent danger to himself justifying self defense. Harris v. State, 104 So.2d 739 (Fla. 2d DCA 1958). Can any reasonable man, reviewing the above facts, believe that McCauley, as of October 22, 1979, was not endangered by Johnson to the extent that his alternatives for survival were either to flee the Orlando area, which he was not legally obligated to do, or to arm himself against a psychopath who featured himself a trained killer and who had repeatedly asserted throughout the community, even on one occasion to the police, that he intended to kill McCauley  just as he had attempted to kill a prior boyfriend of Debbie Donaldson?
The defendant clearly was guilty of a crime. But that crime was not murder. It was carrying a concealed firearm. He was not charged with that offense, and it is not a lesser included offense of homicide. Brown v. State, 245 So.2d 68 (Fla. 1971), modified on other grounds, 408 U.S. 938, 92 S.Ct. 2870, 33 L.Ed.2d 759 (1972).
In addition, there was other reversible error committed during the course of this trial. During the course of his cross-examination of McCauley, the prosecutor inquired as follows:
Q. Isn't it true, Mr. McCauley, you turned to me this morning and said you were going to get me?
A. No.
Q. That's not true?
A. No. Get you for what?
Q. Isn't it true on the way to the police station, you stopped and you told a buddy on the corner, "I just shot me a mother fucker?"
A. No.
Q. Thank you. I don't have any other questions.
The prosecutor did not elicit any testimony or offer any other evidence which would indicate that there was any factual basis for the above-quoted questions.
Prosecutorial comments that are so inflammatory, prejudicial, or otherwise improper that they deprive a defendant of a fair and impartial trial are cause for a new trial. Singer v. State, 109 So.2d 7 (Fla. *1358 1959). Although there was no objection made to these questions, the asking of such questions without any factual foundation is so egregious as to constitute fundamental error.
The judgment and sentence below should be reversed and this case remanded for discharge of the defendant, or, at the very least, a new trial should be ordered because of the prejudicial misconduct of the prosecutor.
NOTES
[1] This quote is from the dissent. Johnny Boy unzipped the bag in which he carried his pistol as he walked with Josa on the way from the party to the car where the killing occurred. Johnny Boy later explained that his gun bag "fell open" as he went around the car. Considering this, the prior threats and the circumstances, going around the car to confront Skit does not appear to be the actions of one who is using all reasonable means within his power to avoid danger and to avert the necessity of using deadly force and the taking of human life. Johnny Boy knew he was well armed and ready to shoot.
[2] Even if there had not been sufficient evidence to justify a finding that the shooting evinced a depraved mind, that would only mandate reversing and remanding with directions to enter a judgment of conviction for manslaughter and a sentence thereon, rather than completely discharging the appellant from his crime, as the dissent maintains. See Pierce v. State, 376 So.2d 417 (Fla. 3d DCA 1979); Martinez v. State, 360 So.2d 108 (Fla. 3d DCA 1978); § 924.34, Fla. Stat. (1979).
[3] Fla. Std. Jury Instr. (Crim.) 2.11(d). See also §§ 776.012, 782.02, Fla. Stat. (1979).
[4] "Deadly force," "imminent commission of a forcible felony," "reasonable," "belief," "danger," "necessary to prevent," "necessary to protect," "circumstances," "reasonably cautious and prudent person," "appearance of danger," "imminent use of unlawful force," "all reasonable means," "duty to retreat," "every reasonable means to escape," "imminent danger of death or great bodily harm," "one who initially provokes the use of force," "relative physical abilities and capacities," "excessive force," "conduct," "hostility," "provocation," "justification," and "mutual combat."
[5] The closest is Ramsey v. State, 114 Fla. 766, 154 So. 855 (1934), cited in footnote 3 of the dissent. A careful reading of that interesting case reveals that the appellate court merely "pardoned" Ramsey because it felt that under the circumstances the victim was a vulgarian, whom no one should be blamed for killing.
[1] As to the admissibility of evidence of the deceased's violent character and his threats, whether known or unknown to the defendant, see Banks v. State, 351 So.2d 1071 (Fla. 4th DCA), cert. denied, 354 So.2d 986 (Fla. 1977), and 16 Fla.Jur.2d Criminal Law § 1136 (1979).
[2] The police did nothing because no offense occurred in their presence, according to Debbie.
[3] The fact that no weapon was found on Johnson does not negate the appearance to McCauley that he had one. See Ramsey v. State, 114 Fla. 766, 154 So. 855 (1934).