478 So.2d 387 (1985)
Judias BUENOANO, Appellant,
v.
STATE of Florida, Appellee.
No. AZ-433.
District Court of Appeal of Florida, First District.
October 29, 1985.
Rehearing Denied December 6, 1985.
James A. Johnston, Pensacola, for appellant.
Jim Smith, Atty. Gen., and Gary L. Printy, Asst. Atty. Gen., for appellee.
NIMMONS, Judge.
Appellant appeals from judgments and sentences for the offenses of first degree murder and first degree grand theft. Appellant was accused of murdering her invalid son, Michael Goodyear, by drowning him *388 and of stealing more than $20,000 from Prudential Life Insurance Company by defrauding the company of insurance proceeds on the son's life. We affirm as to both convictions. Although the appellant raises several points on appeal, the only points which merit discussion are those wherein the appellant claims that the state failed to establish that the victim died as a result of criminal agency of another and that there was insufficient circumstantial evidence to support the appellant's conviction of first degree murder. These are related points and will be discussed together.
After three months of therapy at Walter Reed Hospital beginning January 24, 1980, Michael Goodyear (age 19) had been transferred to Tampa to begin long-term physical therapy and occupational rehabilitation for profound heavy metal neuropathy, a degeneration of nerves outside the spinal column which had left Michael with no nerve or muscle function below his knees and elbows.
On May 12, 1980, appellant traveled to the Veterans' Administration Hospital in Tampa to pick up Michael, her son, and return to their home in Pensacola. Michael required braces, weighing approximately 3 1/2 pounds each, on both legs for ambulation and a Robbins hook on his right arm, weighing approximately two pounds, to enable him to hold objects. His treating physician at Walter Reed, Dr. Barry, had cautioned Michael that adequate provisions for his safety would have to be taken should he go for a boat ride, because he would be unable to swim or save himself should the boat overturn. Michael was discharged to his mother, appellant, so that he could receive long-term rehabilitative care in Pensacola. Appellant had stated that she was spending nearly $40,000.00 in home alterations for Michael's return. Dr. Barry informed appellant that Michael had a severe impairment and might never regain complete function of his arms and legs. According to Dr. Barry, Michael would be unable to walk without his braces, cast a fishing line, or swim.
The day after Michael's discharge from the VA hospital, appellant, Michael, and appellant's other son, James (age 14), and daughter, Kimberly (age 13), went on a fishing trip on the East River in Santa Rosa County. While Kimberly was left ashore at the East River Bridge, appellant, James, and Michael went out in the river in a two-seater canoe in the middle of which a folding lawn chair with legs approximately eight inches high had been placed for Michael. They started fishing between 10:30 and 11:00 A.M., moving upriver along the shore. Michael, seated in the lawn chair, wore both his leg braces with leather shoes, his Robbins hook and, by James' account, a ski belt.
At trial, James testified that approximately a mile upriver from the bridge, about two hours after they had started fishing, they were six to eight feet from shore when a snake fell into the canoe and, in the ensuing confusion, the canoe hit a submerged log and capsized. James said that he was knocked unconscious and remembered nothing more until he was in an ambulance. James' grand jury testimony reflected that he was unsure of how the canoe capsized. His written statement made for an Army investigator referred to the submerged log, but made no reference to the snake. Curiously, James was unable to say whether his written statement was his handwriting or bore his signature.
Ricky Hicks testified that he had gone fishing on the East River between 2:00 and 2:30 PM. He had been fishing for about an hour when he retrieved appellant and James from the river approximately 600 feet from the bridge. Hicks said that an overturned canoe, an ice chest, a flip-flop and a plastic lunch bag were floating near them in the river. Hicks testified that appellant told him that she had "lost the other boy" after a snake had gotten into the canoe which overturned as she tried to hold the snake down with a paddle. She said it was useless to go back for Michael. Upon returning to shore, appellant's first concern appeared to be for James. She asked Hicks for a beer and drank it. Hicks *389 drove appellant's car to a nearby phone where he called the county rescue squad. The county sheriff and Hicks returned to the capsized canoe to look for Michael. They picked up the debris, including two ski belts. Hicks stated that thirty minutes had passed since he had rescued appellant and James. During that time the canoe and debris had barely moved as the river's current was very slow that day.
Rescue squad diver Diamond testified that approximately three hours after the canoe allegedly capsized, Michael's braceladen body was found midriver approximately one-quarter mile upriver from where the canoe had been recovered and appellant and James had been rescued. Diamond stated the river's current was "very, very slow" that day and was no impediment to swimming upstream.
While appellant's version,[1] as stated to Ricky Hicks, was that the canoe capsized during the ensuing excitement over a snake's falling into the craft, she made conflicting statements to an Army investigator and others that the canoe capsized after hitting a submerged object, there being no mention of a snake.
Appellant first reported that Michael was wearing a life jacket, but later stated that he wore a ski belt. While appellant and James stated Michael was wearing a ski belt when the canoe capsized, no ski belt was on Michael's body when it was recovered. Dr. Barry testified that a secured ski belt could not have slipped off Michael, given the braces he was wearing. The appellant's version was that Michael was thrown into the water when the canoe capsized, which she said occurred approximately a mile upstream from where Hicks discovered her and James. She said that she surfaced after the canoe capsized, spotted James face down in the water, cleared his air passage, and resuscitated him. Not finding Michael, she said she began swimming downstream with James until she was picked up by Ricky Hicks. She said the current was too strong to swim anywhere but downstream.
A former neighbor and, later, housemate, Constance Lang, testified that appellant was ashamed of Michael. Appellant would have Lang, who was acting as a live-in baby sitter, take Michael from the house when visitors arrived. Lang said that appellant was distant to Michael, while being close to James and Kimberly. Former neighbor Ken Barnes visited often in appellant's home and observed that James and Michael did not have a good relationship. He felt that appellant had an obvious bond with James, but not with Michael. Appellant's former sister-in-law, Peggy Goeller, testified that she had spoken by telephone with appellant twice in November, 1980. Appellant made no mention of Michaels' death during the first call. During the second call, appellant told her that Michael had recently died during Army maneuvers.
Kimberly testified for the defense that appellant and Michael had a loving relationship. However, she admitted that she had made the statement to appellant during an argument "... just like you killed Michael." On rebuttal, the state presented Kimberly's boyfriend, David Lackey, who testified that Kimberly had told him that appellant had drowned Michael in order to collect insurance.[2]
Bank records showed that appellant had a history of returned checks from June, 1979 until July, 1980. Employment records showed that appellant worked as a licensed practical nurse from December, 1978 to September, 1980, earning $3.50 per hour.
At the time of his death, Michael was covered by several insurance policies. Two policies, one issued in 1962, the other issued in 1964, with face values of $1,000.00 each and double indemnity provisions in case of accidental death, were owned by appellant. On April 5, 1980 there was a *390 request signed by appellant and Michael for duplicates of these policies. A third policy owned by appellant, with a face amount of $15,000.00 and an accidental death benefit of an additional $30,000.00 was purchased March 22, 1978. The fourth policy purchased by appellant on October 8, 1978 insured Michael for $20,000.00 with a double indemnity accidental death provision. There was no requirement that an insured of Michael's age undergo a health physical for the amounts of coverage involved. As a member of the Army, Michael was insured for $20,000.00 under a servicemen's group life policy on which he had designated the principal beneficiary to be determined "by law." Subsequent to Michael's death, appellant, as beneficiary of the above policies, received over $100,000.00 in benefits.
The state's theory was that appellant did not love Michael, viewed him as a burden and set out to kill him in such a way that his death would appear as an accidental drowning so that she could collect the life insurance proceeds. The defense's version was that Michael's death was a result of accidental drowning.
The standard of sufficiency of evidence applicable when a case is based upon circumstantial evidence is: "where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence." McArthur v. State, 351 So.2d 972, 976 n. 12 (Fla. 1977); Heiney v. State, 447 So.2d 210, 212 (Fla. 1984), cert. denied, ___ U.S. ___, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984). But the question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, the verdict will not be reversed on appeal. Heiney, id at 212.
Moreover, it is instructive to remember that the special standard governing sufficiency of evidence in circumstantial evidence cases does not, of course, mean that the trier of fact must believe the defense witnesses regarding facts on which the state has presented contrary testimony. See Drake v. State, 476 So.2d 210 (Fla. 2d DCA 1985) (the defendant's testimony being contradicted, the version of events related by the defendant did not have to be believed); compare Bradford v. State, 460 So.2d 926, 931 (Fla.2d DCA 1984) (version of events related by the defense must be believed if circumstances do not show that version to be false).
Indeed, notwithstanding the overlay of circumstantial evidence principles, the state, as appellee herein, is entitled on appeal to a view of any conflicting evidence in the light most favorable to the jury's verdict. Sellers v. State, 212 So.2d 659 (Fla. 3d DCA 1968); Land v. Patroni, 214 So.2d 94 (Fla. 1st DCA 1968); Bradford v. State, supra; 3 Fla.Jur.2d Appellate Review § 344. Thus, for example, notwithstanding the fact that there may have been evidence via the appellant's statements contradicting the state's evidence that the river current was "very, very slow," the state is entitled to have this court assume the truth of the state's version. Why? Simply because the jury was entitled to so find and such a finding is, as a matter of law, implicit in its verdict.
With the above principles in mind, we find the evidence supports the jury's verdict that appellant was guilty of first degree murder. Based, in part, upon the conflicting statements given by the appellant and the contradictions between the physical evidence (assuming, as we must, the accuracy of the state's testimony regarding such matters as the river current) and the appellant's statements as to how and where the canoe capsized,[3] the jury *391 was entitled to reject the appellant's hypothesis that Michael accidentally drowned as a result of the canoe capsizing. See Warren v. State, 475 So.2d 1027 (Fla. 1st DCA 1985). As in Drake v. State, supra, "[t]he jury had a right to conclude that appellant's statements were not those of an innocent [person]". Id. at 215. See also Rose v. State, 425 So.2d 521, 523 (Fla. 1983).
There was also evidence, as described above, of the appellant's motive for killing Michael. See Drake v. State, supra.
We have examined the other points raised by the appellant and find them to be without merit.
AFFIRMED.
THOMPSON and WIGGINTON, JJ., concur.
NOTES
[1] Appellant did not testify at trial. However, she had made several oral and written statements which were introduced by the state.
[2] This testimony was apparently introduced for the purpose of impeaching Kimberly's earlier testimony that appellant and Michael had a loving relationship.
[3] From the evidence presented, the jury was entitled to conclude, contrary to the appellant's version, that Michael did not drown as a result of the canoe capsizing. This is so because of the substantial distance between the locations where Michael's body was found and where Hicks found the appellant and James near the overturned canoe, given the testimony that the current was so slow that there was very little downstream movement of objects in the water.