492 So.2d 1344 (1986)
Larry G. FOWLER, Appellant,
v.
STATE of Florida, Appellee.
No. BC-400.
District Court of Appeal of Florida, First District.
June 12, 1986.
On Motion for Rehearing September 11, 1986.
Steven L. Bolotin, Asst. Public Defender, Tallahassee, for appellant.
*1345 Gary L. Printy, Asst. Atty. Gen., Tallahassee, for appellee.
ZEHMER, Judge.
Larry Fowler was convicted of first degree felony murder and armed robbery and sentenced to life imprisonment. He appeals his conviction, contending that the trial court erred in denying his motion for judgment of acquittal because the evidence was legally insufficient to support conviction.
Fowler was indicted in one count for committing first degree murder by premeditated design or while engaged in the perpetration of a robbery,[1] and in a second count for committing armed robbery.[2] At trial it was the state's theory, as explained by the prosecutor in opening and closing arguments to the jury, that on January 21, 1983, the victim, Hampton Jerkins, picked up Fowler while the latter was hitchhiking along an interstate highway. The prosecutor theorized that while Jerkins and Fowler were traveling down a dirt road to Fowler's grandmother's house, Fowler decided to rob Jerkins, so he took Jerkins' rifle and forced him to stop the car, made him get out of the car and get down on his hands and knees in the road, and, while standing over Jerkins, shot him in the back. Fowler then took Jerkins' car and wallet and drove back to Pensacola.
The state's case was predicated entirely on circumstantial evidence. The jury exonerated Fowler of premeditated murder, but found him guilty of armed robbery and guilty of felony murder while committing robbery. The trial court denied Fowler's motion for judgment of acquittal and entered a judgment based on the jury verdict. Fowler's motion for new trial was denied. This appeal followed.
To convict Fowler of the felony murder charge, the state had to prove that Fowler killed Jerkins while "engaged in the perpetration of, or in the attempt to perpetrate ... robbery." § 782.04(1)(a), Fla. Stat. (1983). To convict for armed robbery, the state had to prove that Fowler took "money or other property" from Jerkins "by force, violence, assault, or putting in fear" and "in the course of committing the robbery ... carried a firearm or other deadly weapon." § 812.13, Fla. Stat. (1983). Therefore, it was absolutely essential that the record contain competent evidence to establish that Fowler took Jerkins' wallet by force and violence and killed him during the process. Fowler admitted the shooting, but contended it was purely accidental and that he did not rob Jerkins. He stated that after the shooting he found the wallet in Jerkins' car and took it when he left the car several hours after the accidental shooting.
The state's brief on appeal failed to clearly articulate how the circumstantial evidence in the record supported the state's theory of Fowler's guilt. Upon detailed questioning at oral argument, counsel for the state seemed unsure of the state's precise theory of the case and was unable to satisfactorily explain how the evidence proved its theory of guilt or how it was inconsistent with the reasonable hypothesis of innocence offered by defendant. The thrust of the state's argument on appeal has been that, under Rose v. State, 425 So.2d 521 (Fla. 1983), cert. denied, 461 U.S. 909, 103 S.Ct. 1883, 76 L.Ed. 812 (1983), and Heiney v. State, 447 So.2d 210 (Fla. 1984), cert. denied, 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 (1985), whether defendant is guilty beyond a reasonable doubt is a *1346 question only the jury, not the court, may decide. The inability of the state to articulate an understandable theory of the evidence that contradicts Fowler's explanation and excludes his hypothesis of innocence leads us to conclude, after detailed study of the record, that the evidence is legally insufficient to support the judgment of conviction entered by the trial court.
The parties have cited a number of cases which appear to establish conflicting standards for reviewing the sufficiency of circumstantial evidence. E.g., Heiney v. State, 447 So.2d 210; Williams v. State, 437 So.2d 133 (Fla. 1983), cert. denied, 466 U.S. 909, 104 S.Ct. 1690, 80 L.Ed.2d 164 (1984); Rose v. State, 425 So.2d 521; Jaramillo v. State, 417 So.2d 257 (Fla. 1982); McArthur v. State, 351 So.2d 972 (Fla. 1977); Davis v. State, 90 So.2d 629 (Fla. 1956); Mayo v. State, 71 So.2d 899 (Fla. 1954); Buenoano v. State, 478 So.2d 387 (Fla. 1st DCA 1985); Fox v. State, 469 So.2d 800 (Fla. 1st DCA 1985), rev. denied, 480 So.2d 1296 (Fla. 1985); Miles v. State, 466 So.2d 239 (Fla. 1st DCA 1985); Davis v. State, 436 So.2d 196 (Fla. 4th DCA 1983), rev. denied, 444 So.2d 418 (Fla. 1984); Atkinson v. State, 429 So.2d 726 (Fla. 1st DCA 1983); Gains v. State, 417 So.2d 719 (Fla. 1st DCA 1982) rev. denied, 426 So.2d 26 (Fla. 1983); Vick v. United States, 216 F.2d 228 (5th Cir.1954). It is generally true, as stated in McArthur, that "a review of prior decisions ... is not helpful to the analysis required here, since the nature and quantity of circumstantial evidence in each case is unique." 351 So.2d at 976. Nevertheless, the cited decisions set forth certain consistent principles of law which govern our review of the legal sufficiency of the circumstantial evidence.
It has long been held in Florida that "where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence." McArthur v. State, 351 So.2d at 976, n. 12 (emphasis supplied). This means, as stated in Mayo, "Evidence which leaves one with `nothing stronger than a suspicion' that the defendant committed the crime is not sufficient to sustain a conviction." 71 So.2d at 904. "In applying the standard, the version of events related by the defense must be believed if the circumstances do not show that version to be false." McArthur, 351 So.2d at 976 (emphasis supplied). This last-quoted proposition has been the law in this state for at least sixty years. Holton v. State, 87 Fla. 65, 99 So. 244 (1924).
While these long-standing principles impose a stringent standard of proof on the state in circumstantial evidence cases, it has been argued in recent years that this standard of proof has been relaxed by several appellate decisions which appear to curtail the court's power to decide whether the evidence is inconsistent with any reasonable hypothesis of innocence. In both Heiney v. State, 447 So.2d 210, and Rose v. State, 425 So.2d 521, the Supreme Court said that "the question of whether the [circumstantial] evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury's verdict, we will not reverse a judgment based upon a verdict returned by the jury." 447 So.2d at 212. More recently, in Buenoano v. State, 478 So.2d 387, this court, following Heiney, said, "The special standard governing sufficiency of evidence in circumstantial evidence cases does not, of course, mean that the trier of fact must believe the defense witnesses regarding facts on which the state has presented contrary testimony" and that "the state ... is entitled on appeal to a view of any conflicting evidence in the light most favorable to the jury's verdict." Id. at 390 (emphasis supplied). These decisions, the state argues to us, require that we must defer to the jury verdict as we are not permitted to substitute our judgment for the jury's.
Despite the apparent inconsistency of the statements of law quoted from the various decisions, neither Heiney nor Rose has disturbed the long-standing principles *1347 enunciated in Mayo and McArthur. As we read Mayo and McArthur, the court held that a conviction returned by the jury could not be sustained by the court unless there was competent and substantial evidence "inconsistent with any reasonable hypothesis of innocence." In other words, it is for the court to determine, as a threshold matter, whether the state has been able to produce competent, substantial evidence to contradict the defendant's story. If the state fails in this initial burden, then it is the court's duty to grant a judgment of acquittal to the defendant as to the charged offense, as well as any lesser-included offenses not supported by the evidence. This must be so because "the version of events related by the defense must be believed if the circumstances do not show that version to be false." McArthur, 351 So.2d at 976.[3] Even in our recent opinion in Buenoano we recognized that the jury could choose to disbelieve the defense only "regarding facts on which the state has presented contrary testimony." Buenoano v. State, 478 So.2d at 390. Otherwise, there would be no function or role for the courts in reviewing circumstantial evidence, as was stated so well in Davis v. State, 436 So.2d at 200: "If we were to follow the state's logic, a trial judge could never answer that question and could never grant a motion for judgment of acquittal pursuant to Florida Rule of Criminal Procedure 3.380 when the evidence [is] circumstantial. Instead, every case would have to go to the jury."
As we read the opinions in Rose, Williams, and Heiney, the Supreme Court is merely recognizing the jury's right to determine whether the state has disproved the defendant's hypothesis of innocence in those cases where there is evidence presented by the state that contradicts the defendant's story. In such cases it becomes the jury's duty, as finders of fact, to determine what evidence is credible and whether the credible circumstantial evidence that is "inconsistent with the defendant's hypothesis of innocence" is sufficient to "exclude" every reasonable hypothesis of innocence beyond a reasonable doubt. It is our responsibility on this appeal, therefore, to review the evidence as a whole and determine whether the state has presented sufficient, competent evidence impeaching defendant's story to allow the jury to resolve the disputed issues of material fact.
Initially, we must consider whether, in order to be legally sufficient, the circumstantial evidence relied on by the state, must lead only to an inference or conclusion that contradicts defendant's hypothesis of innocence, or whether it may be susceptible of two or more inferences, one being consistent with defendant's story and others being inconsistent with such story.[4] We conclude that a circumstantial evidence case should not be submitted to the jury unless the record contains competent, substantial evidence which is susceptible of only one inference and this inference is clearly inconsistent with the defendant's *1348 hypothesis of innocence.[5] Evidence that leaves room for two or more inferences of fact, at least one of which is consistent with the defendant's hypothesis of innocence, is not legally sufficient to make a case for the jury.[6]
For purposes of the present appeal, since we must review the record to determine whether there is any competent evidence directly inconsistent with defendant's version of how the shooting occurred, we first summarize defendant's story and then consider the evidence that the state argues conflicts with that story and creates a jury issue.
Larry Fowler testified that on the morning of January 21 he completed repair work on a man's truck in Mobile, Alabama, and was paid one hundred thirty dollars for the job. He then began hitchhiking to Century, Florida, where his grandmother lived, and was picked up by a man identified as the victim, Jerkins. Fowler told Jerkins he was going to Century, and Jerkins said he knew the area because he had gone to high school there. Jerkins was drinking whiskey and "seemed like he ... had a good buzz." There was a bottle of whiskey on the seat and a small ice chest which held about a six-pack of beer. According to Fowler, Jerkins offered him a beer and he took one. As they traveled, Jerkins told Fowler he was going on a hunting trip and asked Fowler to take a look at his rifle on the back seat. Fowler took the gun from the back seat, looked at it, and put it back.
After a while, a report over the citizen's band radio suggested that a state trooper was in the area, and Jerkins pulled the car over and asked Fowler to drive. As Fowler drove, Jerkins took the gun from the back seat and began playing around with it, with the barrel pointing toward Fowler. Fowler asked Jerkins if the gun was loaded, and he said it was and emptied the shells. The shells fell to the floor and Fowler, feeling uneasy, pulled over and asked Jerkins to resume driving. When they were again underway, Jerkins asked Fowler to pick up the shells and reload the gun. Fowler knew nothing about guns, so Jerkins explained how to reload and asked Fowler to get a box of shells from the back seat and put another cartridge into the gun. Fowler said he put four or five cartridges in the rifle and then returned it to the back seat.
When they reached the Flomaton exit, Fowler told Jerkins that this was where he needed to get off, and Jerkins pulled over and let him out. Jerkins asked Fowler to throw the whiskey bottle away, and defendant tossed it into the woods and then began hitchhiking down the road. Jerkins drove away, headed north.
Some twenty minutes later, Jerkins came back down the road and told Fowler he would take him to Flomaton, so Fowler again got into the car. Jerkins was now drinking beer. When they arrived in Flomaton, Jerkins asked Fowler to go to a certain bar and have a drink with him. Fowler agreed, and Jerkins said that after they had a drink he would drive Fowler to his grandmother's house.
They entered the bar, Fowler ordered a beer, and Jerkins pulled some money from his shirt pocket to pay for it. Two or three women were sitting at the other end of the bar, and Jerkins asked the waitress to see what they would like to drink. She served the women drinks, and Jerkins paid for *1349 them. Jerkins then asked one of the women to sit down and talk to him. Fowler moved over so that the woman could sit between them, but she chose to sit next to Fowler. The three talked for a while, and Fowler asked whether she would be busy that night and if she would like to go to dinner or a movie. The woman refused. Jerkins got up from the bar, tapped Fowler on the shoulder, told him that if he wanted a ride he'd better come on, and walked out. Jerkins was in the car when Fowler came outside and Fowler got into the car. They headed towards his grandmother's house, and Fowler noticed that the rifle was now beneath the front seat, between Jerkins' legs.
When they reached the road leading to his grandmother's house, Fowler said he would get out of the car. Jerkins asked him how far down the road the house was, and Fowler said it was a mile and a half to two miles. Jerkins said he would take him, and began driving very fast down the road. Fowler asked him to slow down because the road was not straight, and Jerkins slowed to about forty miles per hour, then hit the brakes and turned onto another dirt road. Fowler asked where he was headed, and Jerkins said he had to use the bathroom. When Jerkins stopped the car, he asked Fowler why he "stole [his] woman" back at the bar. Fowler stated that he didn't know what Jerkins was talking about, and Jerkins repeated that Fowler had "stolen his woman" and that he was "going to have to make up for it." Jerkins then told Fowler he was going to have to play the role of a woman, grabbed him by the arm, and told him to get into the back seat and take his clothes off. Fowler told Jerkins he was crazy; and as Fowler went to open the car door, Jerkins picked up his rifle from the floorboard. Fowler jerked away, jumped from the car, and started to run, but slipped on the dirt road. As he was picking himself up, Jerkins had come around to the back of the car and was holding the rifle on him. Jerkins told him to get back in the car and take his clothes off. Fowler was frightened and stood there with his hands up. Jerkins poked him twice in the chest with the gun barrel and yelled at him to get back into the car. Fowler diverted Jerkins' attention by telling him someone was coming down the road, and when Jerkins turned his head Fowler pushed the gun up and hit Jerkins with his left hand. Fowler tried to trip Jerkins but was hit on the side of the neck and knocked to the ground. Fowler then grabbed the stock of the gun, which was against his chest, and Jerkins stepped over defendant, attempting to pull the weapon away. As they were grappling with the gun, it went off and Jerkins fell to the ground and did not move.
Fowler pulled the body toward the side of the road, got into the car, and left. He drove a short distance down the dirt road and decided to go back to his grandmother's house, tell her what had occurred, and call the police. He turned around; and as he drove back along the dirt road, he had to stop the car to avoid hitting the body lying in the road. Defendant rolled the body over, farther onto the side of the road, and drove to the end of the dirt road. Instead of going to his grandmother's house, he began driving toward Pensacola. On the way he dropped a cigarette on the floor, and after braking to pick it up he found a wallet on the floor, which he picked up and put under the arm rest. Fowler drove to University Mall, parked in the back parking lot, and, once inside the mall, ran into an acquaintance and another person who wanted to go get some beer. When they got into the car, the stranger picked up the rifle from the back seat and asked Fowler if he was going to shoot somebody with it. Fowler said the rifle already had shot someone. They went to a gas station and bought some beer, stopped by a bowling alley, and then returned to the mall. After Fowler dropped off his companions, he went to the trailer of a former neighbor to seek advice, but someone came into the trailer and Fowler left without discussing his situation.
Fowler then drove to the airport and parked the car, leaving the keys inside. He took the wallet from under the arm rest *1350 and put it in his pocket. The night was foggy and no flights were departing. Fowler took a taxi and first asked to be taken to Mobile, but changed his mind and decided to go to Century. Fowler paid the taxi driver fifty dollars, and the driver dropped him at his grandmother's house. His grandmother noticed marks on his face and arm, but Fowler shrugged off questions. He got some clothes, borrowed her car, and returned to Mobile.
About a week later Fowler called his grandmother, and she informed him the police had been looking for him and suspected him of homicide. Fowler told her, without going into detail, what had happened. At his grandmother's suggestion, Fowler contacted his former minister to discuss the situation. The two went to church that night, and the next morning they saw a lawyer in Mobile. The lawyer advised Fowler to turn himself in and explain the circumstances of the shooting. The following day Fowler turned himself in at the sheriff's department.
On cross-examination Fowler was asked how his fingerprints came to be on a french fry box and drinking straw in the car and when he bought them. Fowler said he didn't buy them, that they were already on the floorboard and he must have moved them when he was picking up the shells that Jerkins had ejected from the gun. The prosecutor twice asked Fowler "wasn't Mr. Jerkins on his hands and knees when you shot him in the back?" and Fowler twice answered, "No, sir." The prosecutor then asked, "Didn't you walk up and then take his money from him." Fowler again answered, "No."
First, we point out that several facts established by the state's evidence actually support, rather than contradict, Fowler's story. For example, had Fowler forced the victim onto his hands and knees on the road and shot him in the back, as theorized by the state, the bullet, which according to medical testimony entered the victim on the right side below the ribs and exited the left shoulder, should have struck the sandy road; yet, state investigators were unable to find the bullet, despite a thorough search with metal detectors. On the other hand, if the gun discharged while Fowler was on the ground with the barrel pointed upward, the bullet would have traversed through the body, as described by the medical examiner, and proceeded through the air to a distant point. Additionally, with the victim on his hands and knees it is difficult to see how the bullet could have entered his lower right side and exited his left shoulder unless the defendant was also on his hands and knees, a scenario not likely if the defendant was executing the victim as theorized by the state. Finally, the fact that money was found in the victim's shirt and pants pockets and a gold watch and pendant were left on the victim, as testified to by police, is inconsistent with the notion that robbery was the purpose leading to the victim's death. We cannot ignore the fact that this evidence corroborates, rather than controverts, Fowler's version of the killing. Paz v. State, 480 So.2d 701 (Fla. 3d DCA 1985).
We do not doubt that the evidence adduced by the state, particularly the evidence as to Fowler's actions after the shooting, casts considerable suspicion upon him. But mere "suspicion" is not enough. Mayo v. State, 71 So.2d at 904. When the state presents circumstantial evidence of a particular fact which is arguably consistent with the defendant's story, then that fact is simply not probative of the defendant's guilt. McArthur v. State, 351 So.2d at 976. The state contends that several circumstances conflict with Fowler's story and create a jury issue under Rose, Heiney, and Buenoano. For the following reasons we find that these circumstances are insufficient to controvert Fowler's story.
The first evidentiary fact relied upon by the state is that the cab driver who drove Fowler from the airport to his grandmother's house told Fowler the fare was fiftyfive dollars and that Fowler gave him a one hundred dollar bill and was given only twelve dollars in change. Fowler, on the other hand, testified that he paid the cab *1351 driver fifty dollars. The fact that Fowler's testimony conflicts with the cab driver's on this collateral matter undoubtedly bears on Fowler's credibility regarding his ability to accurately recall the details of the cab ride, but it is not probative of the immediate circumstances surrounding the shooting. The incident with the cab driver took place several hours after the shooting and fails to shed any light on whether the killing was accidental or intentional. Since Fowler admits taking the victim's wallet, one could infer that Fowler used money from Jerkins' wallet to pay the cab fare; but one could as easily infer with equal certainty that Fowler paid the cab fare with his own funds since he testified without contradiction that he received one hundred thirty dollars for repairing a car earlier that day. We do not consider evidence of this purely collateral transaction sufficiently probative to controvert or impeach Fowler's hypothesis of innocence regarding the shooting incident itself.
Next, the state urges that Sergeant Thomas, an officer testifying for the state, was asked if he saw any signs of a struggle or fight at the scene of the shooting, and he responded, "Not that I could determine, no, sir" (R. 147); yet, the state argues, Fowler testified there was a struggle. The ambiguous nature of Thomas' testimony is obvious: Did he determine the negative, i.e., that no struggle took place, or was he simply unable to determine, one way or the other, whether a struggle took place? Since no further predicate for this opinion was laid by the state, we conclude that it does not constitute competent, substantial evidence disproving defendant's version, especially in view of Sgt. Thomas's further testimony that there were several sets of tire tracks and drag marks on the road and that any signs of a struggle could easily have been obliterated. On the other hand, the uncontroverted evidence of cuts and bruises on Fowler, and the abrasion over the victim's left eye, confirmed by the medical examiner testifying for the state, constitute physical evidence that corroborates Fowler's version. The state's version of the shooting does not explain how these cuts, bruises, and abrasions were inflicted.
Next, the state points to the testimony of two long-time friends of Jerkins that he had never shown any homosexual tendencies. This evidence, the state argues, is sufficient to create a jury issue regarding Fowler's explanation that Jerkins made homosexual threats and advances. Accepting the friends' testimony as true, it establishes only that these two witnesses had not observed Jerkins exhibit any homosexual activities or tendencies on unspecified or undescribed occasions. The state failed to prove the predicate necessary to establish the negative of the fact, that Jerkins would never have made homosexual advances under the circumstances of this case. Lacking the proper predicate for establishing this negative fact, the testimony did not overcome or impeach Fowler's direct testimony that Jerkins made homosexual threats and advances on this particular occasion, particularly in view of the evidence that Jerkins was very inebriated[7] at the time of the shooting and apparently felt that defendant had "stolen his woman" at the bar.[8]
The state next points out that no gunpowder residue was discovered on the deceased's body, although Fowler contends that the victim was shot at very close range. The state concedes, however, that there was no testimony in the record that gunpowder residue would be expected to be found on the victim's body if he were shot at close range. Without such testimony, the evidence regarding the nonexistence of *1352 residue has no probative value with respect to defendant's guilt, and the state has specifically indicated that it does not request us to take judicial notice of the fact that residue would be expected to be on a person shot at close range. The absence of residue, therefore, is not competent evidence contradicting defendant's story.
Finally, the state relies upon the testimony of Jerkins' friends that Jerkins almost always carried his wallet on his person, to controvert defendant's testimony that he found the wallet on the floorboard of the car. But the friend's testimony does not exclude the inference that Jerkins had placed the wallet on the floorboard of his car on this occasion. A state witness also testified that Jerkins' wallet had recently been stolen by a pickpocket, so one might infer that he had decided not to carry his wallet with him into the bar.
The evidence relied on by the state in this case falls short of establishing the kind of circumstances found sufficient to make out a case for the jury in Buenoano, Rose, and Heiney. For example, there is no evidence of conflicting stories by Fowler given at different times to explain what happened.[9] The motive of robbery at the time and place of the killing is inconsistent with the fact that money and valuable jewelry was found on the deceased's body. The state failed to present competent testimony or physical evidence to impeach or directly controvert Fowler's explanation of what happened. We have discerned nothing in the record to support a finding that Fowler decided to rob and kill Jerkins and did so by standing over him in the road and shooting him in the back. To conclude that the shooting occurred as described by the state, rather than as described by Fowler, would amount to pure speculation. The circumstantial evidence of guilt of the offenses charged in this case is as lacking as that reviewed and held insufficient in Holton v. State, 87 Fla. 65, 99 So. 244 (1924). The conviction must be reversed.
We further hold that the evidence is insufficient to sustain conviction on any lesser-included offense of the felony murder charge because the defendant's hypothesis that the shooting was purely accidental and in self-defense has not been overcome. It is clear, however, that the evidence is sufficient to sustain a finding of guilt on the offense of grand theft since Fowler admitted taking Jerkin's wallet and the state presented competent evidence that would support a finding that the wallet contained more than one hundred dollars at the time of the theft.[10] Fowler made no attempt at trial to challenge the state's evidence regarding the amount of money in the wallet.
The case is remanded with directions to vacate the judgment and sentence and enter a judgment of conviction of grand theft in violation of section 812.014(2)(b)1, Florida Statutes (1983), and sentence defendant on such charge.[11]
REVERSED and REMANDED.
MILLS and SHIVERS, JJ., concur.

ON MOTION FOR REHEARING
ZEHMER, Judge.
The state's motion for rehearing urges that we have ignored the proper standard of review of the defendant's motion for judgment of acquittal, i.e., that the motion takes all facts and inferences in the light most favorable to the state, citing, inter alia, Spinkellink v. State, 313 So.2d 666 (Fla. 1975), and Lincoln v. State, 459 So.2d 1030 (Fla. 1984). Further, the state asserts that we have "fashioned" a new standard of review in reversing Fowler's conviction.
*1353 Perhaps the structure of our opinion, which dwelled upon Fowler's testimony in greater detail than the testimony of the state's witnesses, led the state to interpret our opinion as suggesting a new standard of review for circumstantial evidence cases based on defendant's in-court testimony. We intended no such interpretation. The discussion of Fowler's testimony and the state's responsive contentions regarding evidence said to establish guilt was structured merely as a convenient means of presenting the operative facts. It should not be construed as implying that the state proved a prima facie case of felony murder which was not dissipated until defendant testified.
Urging us to reconsider our decision, the state offers yet another explanation of the events leading to the death of Mr. Jerkins which was not presented in the trial court, nor in the state's brief, nor at oral argument. We have no doubt that the state could offer even more different explanations of what occurred on that fateful evening in January 1983 that might be consistent with guilt of felony murder. We say this because the evidence presented by the state was so sparse and inconclusive that several reasonable hypotheses of guilt and innocence may be "fashioned" from the evidence when construed in a light most favorable to the state.
Our opinion did not fashion a new standard of appellate review for circumstantial evidence cases. Rather, it is the state that seeks to apply a new standard by insisting that Spinkellink, Lincoln, Heiney,[1] and Allen[2] require a trial court to submit a circumstantial evidence case to the jury whenever both inferences of guilt and innocence may be reasonably drawn from the evidence even though the state's evidence fails to dispute the inferences of innocence and thereby create a question of fact for the jury. In each of the cases cited by the state in support of this contention, the state's evidence was sufficient to dispute the factual inferences of innocence relied on by defendant, and those decisions are therefore distinguishable from this case. Our review of the evidence in this case led us to conclude that the state's evidence not only failed to dispute the reasonable hypothesis of innocence urged by Fowler but did not prove the state's theory of the case and was, in part, corroborative of defendant's explanation. Thus, applying the usual standard of review, the state's evidence was legally insufficient to withstand defendant's motion for judgment of acquittal.
Appellee's counsel points out, in response to the state's motion for rehearing, that our opinion contains a misstatement regarding the proof that "no gunpowder residue was found on the deceased's body." The testimony supporting the state's assertion of this fact is equivocal at best and does not appear to prove either the existence or nonexistence of this fact. Accordingly, we modify our prior opinion to reflect that the state's evidence failed to prove whether gundpowder residue was or was not found on the deceased's body.
With the foregoing clarification and modification of our opinion, the motion for rehearing is DENIED.
MILLS and SHIVERS, JJ., concur.
NOTES
[1] Count 1 reads as follows: "Larry Gail Fowler, did unlawfully from a premeditated design to effect the death of a human being, to-wit: Hampton Harvey Jerkins or while engaged in the perpetration of or in an attempt to perpetrate a felony, to-wit: Robbery, did kill and murder said Hampton Harvey Jerkins by shooting him with a rifle, in violation of Sections 782.04 and 775.087(2), Florida Statutes."
[2] Count 2 reads as follows: "Larry Gail Fowler, did unlawfully by force, violence, assault or putting in fear, and with the intent to permanently deprive, take certain property, to-wit: U.S. money, the property of Hampton Harvey Jerkins as owner or custodian, from the person or custody of Hampton Harvey Jerkins and in the course of committing said Robbery, carried a firearm, to-wit: rifle, in violation of Sections 812.13 and 775.087(2), Florida Statutes."
[3] Because Fowler testified in the instant case, we do not consider what the phrase, "the version of events related by the defense," McArthur, 351 So.2d at 976, encompasses in a case wherein the defendant exercises his right to remain silent.
[4] The state's argument on this question is quite similar to the argument previously made to us in Fox v. State, 469 So.2d 800, 803, in which the state urged that we abandon the stricter rule requiring the court to decide if the circumstantial evidence is inconsistent with every reasonable hypothesis of innocence and adopt the more liberal standard which allows the jury to choose among several reasonable constructions of the evidence and determine whether the evidence establishes guilt beyond a reasonable doubt, citing United States v. Bell, 678 F.2d 547 (5th Cir.1982), and United States v. Kincade, 714 F.2d 1064 (11th Cir.1983). The approach advocated by the state would require the court to defer to the jury's choice of acceptable inferences where more than one inference could be drawn. We previously declined in Fox to fashion such a rule in Florida, and the Supreme Court declined review. Likewise, we decline to adopt an interpretation of Rose and Heiney which would have this same effect since to do so would result in the overruling of a long line of Florida cases holding to the contrary. The Supreme Court has not yet clearly stated that it intends to overrule these cases.
[5] The McArthur court noted that the case before it was distinguishable from those cases "in which a particular circumstance is consistent with only one conclusion." Id. at 976, n. 13 (emphasis supplied).
[6] By way of example to demonstrate the quality of evidence necessary to send a case to the jury, in Buenoano the defendant testified that her canoe capsized and her son fell overboard and drowned. The state introduced evidence to show that the victim's body was found a substantial distance from where the canoe capsized and that the current in the river was so negligible that there was very little downstream movement of objects. This evidence directly conflicted with the defendant's story. Additionally, the state elicited testimony of various pretrial statements made by the defendant as to how her son's death occurred that directly conflicted with the defendant's story at trial. Obviously, such evidence, being in direct conflict with the defendant's hypothesis of innocence, was sufficient to create issues for the jury.
[7] The medical examiner testified that Jerkins' blood alcohol level was .29 milliliters. The extent of intoxication at this level was not established by the state. A blood alcohol level of.10 gives rise to a presumption in DUI prosecutions that a person is under the influence of alcohol to the extent that normal faculties are impaired. § 316.1934, Fla. Stat. (1985). A .29 reading strongly corroborates, rather than controverts, Fowler's testimony that Jerkins was highly intoxicated.
[8] Jerkins' wife had died several weeks before this episode.
[9] Fowler made a pretrial statement to the authorities when he turned himself in. He later moved, unsuccessfully, to suppress the statement, yet the state never referred to the statement during trial, nor has it been included in the record on appeal.
[10] Fowler was charged only with taking money in the course of the robbery (see footnote 2, p. 1345, supra). He was not charged with stealing the automobile.
[11] See Government of Virgin Islands v. Josiah, 641 F.2d 1103 (3d Cir.1981), and cases cited therein. Cf. rule 3.620, Fla.R.Crim.P.
[1] Heiney v. State, 447 So.2d 210 (Fla. 1984).
[2] State v. Allen, 335 So.2d 823 (Fla. 1976).