# Supreme Court of Florida

_____

No. SC16-2170
_____

**MALIK JIMER WILLIAMS,**
Petitioner,

vs.

**STATE OF FLORIDA,**
Respondent.

January 4, 2019
**<u>REVISED OPINION</u>**

QUINCE, J.

Malik Jimer Williams seeks review of the decision of the Second District Court of Appeal in *Williams v. State*, 203 So. 3d 1020 (Fla. 2d DCA 2016), on the ground that it expressly and directly conflicts with decisions of this Court on questions of law. We have jurisdiction. *See* art. V, § 3(b)(3), Fla. Const. For the following reasons, we approve in part and quash in part the decision of the Second District and remand with instructions to remand to the trial court for proceedings consistent with this opinion.

FACTS

On the night of February 15, 2013, Williams and his cousin, Kito Felton, were riding Williams' bicycle home from a friend's house on 23rd Avenue in Tampa, Florida. Williams pedaled and Felton rode on the handlebars. Williams and Felton rode down 23rd Avenue, made a right on 34th Street, made a left on 22nd Avenue, made a right onto 37th Street and then made a left onto 21st Avenue heading towards 40th Street near where Williams resided with his brother at 46th and Sand Dune.

Also in the vicinity were Reginald Johnson and John Edward Brown, III. Johnson and Brown were leaving the residence of Rosa Santos on their "Big Ripper" bicycles to go to Johnson's residence on 35th Street to prepare for a birthday party. Johnson stated that he would typically take 26th Avenue to cross 50th Street to get to 49th Avenue and 26th Street, where he would turn until he got to 21st Avenue and continue on 21st until he got to 35th Street. Johnson and Brown were heading west on 21st and stopped on Arrow, which was before 40th, still heading towards Johnson's mother's house. After stopping at Arrow to speak to Venda Hayward, Johnson and Brown went back the way they came. Johnson testified that he and Brown were "thinking about going to Shells" and that they wanted to go to that particular store rather than one closer to his mother's house "[b]ecause Shell is like a neighborhood store."

Williams testified that he saw Johnson and Brown at the intersection of 21st and 40th heading the opposite direction. He did not previously know Brown, but did know Johnson from middle school. Williams testified that Johnson asked them if they were straight and that he replied he did not want any problems. Williams testified that he knew they were from Grant Park and that Grant Park and his own neighborhood, Jackson Heights, do not get along. Williams told Felton to prepare to fight and "we fitting to get our ass whooped." Williams then testified that he saw Johnson and Brown turn their bikes around and that, eventually, Johnson maneuvered to cut Williams off and that Brown was behind him with a gun in his right hand in his lap.

Williams testified that, at this point, he slammed his brakes and jumped off his bike in an attempt to either run away or fight and that his maneuver caused Brown to fall off of his bike. Johnson testified that, after turning and returning eastbound and passing Williams and Felton, all the boys except Johnson fell off their bikes. Williams testified that Brown flipped over his handle bars and dropped the gun in front of the bicycle, that both he and Brown reached for the gun, that he was able to pick it up before Brown, and then they fought over it. All the testimony agrees, and video evidence corroborates, that however three of the boys ended up off their bikes, Johnson dismounted, ran back, and joined the altercation.

Both Williams and Johnson testified that Johnson took Felton near the Hartline gate while Williams and Brown stayed in a relatively static location.

During the course of the altercation, Williams shot Brown twice—once in the head and once in the chest. Williams then turned and shot Johnson, who received one gun shot in his hand. Williams and Felton then fled, Felton taking Brown's bicycle and Williams on his own bicycle.

Williams testified that when he arrived at his brother's, his brother took him to their mother's house who then encouraged Williams to talk to the police.

The jury found Williams guilty of first-degree premeditated murder for the death of Brown. The jury did not convict Williams of robbery but did find that he was guilty of the lesser included offense of theft.

On direct appeal to the Second District Court of Appeal, the district court first issued a per curiam affirmance (PCA). Then, after the court denied Williams' motion to stay mandate and motion for reconsideration, on its own motion the court withdrew the PCA and substituted a written opinion. The court dispensed with Williams' claims on appeal in one sentence: "[Williams] raises two issues in this appeal, neither of which require reversal." *Williams*, 203 So. 3d at 1021. The district court then explained that Williams' sentence for first-degree murder did not violate *Miller v. Alabama*, 567 U.S. 460 (2012), and that his sentence for the

attempted first-degree murder did not violate *Graham v. Florida*, 560 U.S. 48 (2010). The district court therefore affirmed Williams' convictions and sentences.

**DISCUSSION**

In his first issue on appeal, Williams argues that the trial court erred in denying his motion for judgment of acquittal. The Second District did not discuss the merits of this issue but we nevertheless address it here.

We review the denial of a motion for judgment of acquittal de novo; however, all evidence and inferences therefrom are viewed in a light most favorable to the State. *McDuffie v. State*, 970 So. 2d 312, 332 (Fla. 2007); *Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002). A defendant who moves for a judgment of acquittal admits the facts in evidence and every conclusion favorable to the State that may be reasonably inferred from said evidence. "If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction." *Pagan*, 830 So. 2d at 803.

In a case where a defendant alleges self-defense, the State must prove that the defendant did not act in self-defense beyond a reasonable doubt. *See Cruz v. State*, 189 So. 3d 822, 825-26 (Fla. 4th DCA 2015) (quoting *Brown v. State*, 454 So. 2d 596, 598 (Fla. 5th DCA 1984)). A trial court must grant a judgment of acquittal when the State's case is legally insufficient to rebut a defendant's prima

facie case establishing self-defense. *Id.* at 826 (citing *Fowler v. State*, 921 So. 2d 708, 711-12 (Fla. 2d DCA 2006)). However, a judgment of acquittal should be denied where a jury would reasonably reject the defendant's explanation of self-defense. *Id.* (citing *Romero v. State*, 901 So. 2d 260, 265-66 (Fla. 4th DCA 2005)). Any inconsistency between the evidence and defense theory must be resolved by the finder of fact. *Orme v. State*, 677 So. 2d 258, 262 (Fla. 1996).[1] But "[e]vidence that leaves room for two or more inferences of fact, at least one of which is consistent with the defendant's hypothesis of innocence, is not legally sufficient to make a case for the jury." *Fowler v. State*, 921 So. 2d 708, 712 (Fla. 2d DCA 2006) (quoting *Fowler v. State*, 492 So. 2d 1344, 1348 (Fla. 1st DCA 1986)); *see also Stieh v. State*, 67 So. 3d 275, 279 (Fla. 2d DCA 2011).

In order to establish a prima facie case of self-defense, a defendant must show that he (1) was attacked in a place where he had a right to be, (2) was not engaged in any unlawful activity, and (3) reasonably believed it was necessary to

---

1. This is unlike a review of the sufficiency of the evidence to sustain a conviction where an appellate court must determine whether, when reviewing the facts in the light most favorable to the State, there is competent, substantial evidence to sustain the conviction on appeal. Williams did not contest the sufficiency of the evidence to sustain his conviction for first-degree premeditated murder and it is therefore not before this Court for review. Instead, this Court is tasked with determining merely whether the question was appropriately presented to the jury for consideration notwithstanding the subsequent verdict inconsistent with the State's rebuttal to Williams' self-defense theory.

use force to prevent death or great bodily harm. *See Leasure v. State*, 105 So. 3d 5, 13 (Fla. 2d DCA 2012) (citing § 776.013(3), Fla. Stat. (2008)). However, the jury is not required to accept the defendant's version of the facts and in fact "must consider the probability or improbability of the defendant's credibility in light of the circumstances established by other evidence." *Leasure*, 105 So. 3d at 14 (citing *Darty v. State*, 161 So. 2d 864, 872 (Fla. 2d DCA 1964); *Teague v. State*, 390 So. 2d 405, 406-07 (Fla. 5th DCA 1980)).

Below, Williams alleged that he acted in self-defense after Johnson and Brown followed him and Felton on 21st Avenue and appeared to be carrying a weapon. Williams stated that he knew he was about to be beaten and prepared himself to take the beating by getting off his bike. Because Brown lost control of the weapon when they all fell from their bikes, Williams alleges he was able to fight to get the weapon and use it in self-defense. The evidence found on the scene supports Williams' version of events.

Law enforcement discovered two unfired .40 caliber rounds[2] at the scene which is consistent with Williams' testimony that he was unfamiliar with weapons and attempted to cock the gun before each time he fired. Law enforcement also

---

2. No firearm was recovered at the scene. However, the ballistics recovered from the victims were the same caliber as the fired and unfired rounds recovered at the scene.

found a cell phone, currency, a key ring, cigars, and condoms on Brown's person when they arrived on scene, which supports Williams' assertion that he had no intention of robbing the victim.

Because Williams presented a prima facie case of self-defense, it was necessary for the State to refute his claim beyond a reasonable doubt. The State's theory of the case was that Williams and Felton attempted to rob Brown and therefore could not claim self-defense because the altercation was a result of the robbery. To survive the judgment of acquittal, a reasonable jury would have to believe the testimony of surviving victim, Reginald Johnson, that he and Brown just happened to turn around and ride their bikes in the opposite direction, passing Williams and Felton, because they decided to double back and go to a convenience store. The jury would also have to accept Johnson's testimony that Felton told Brown to "give it up" meaning he was attempting to rob Brown of his bicycle and that either Felton or Williams pulled Brown off his bike, starting the altercation that resulted in Brown's death.

As to corroborating evidence, none of the eyewitnesses were able to corroborate either party's explanation of what led to the altercation. Symone Watts, who worked as a security guard at Hartline where the altercation took place, testified that she heard loud voices, which made her look up from her book. Then she saw someone hit the ground, get up quickly, and begin firing. Watts' version

of events does not support either Williams' or Johnson's testimony. Williams never testified that he had fallen to the ground before getting the gun but it is possible that what she saw was Williams bending over to get the gun after it fell from Brown's possession. Her testimony likewise does not support Johnson's testimony because he stated that Brown was the only one who fell from his bike after being pulled off. Because both Williams and Johnson testified that only Brown fell to the ground, Watts' testimony would make Brown the shooter, which is erroneous. Further, Watts testified that she was unclear that night and even the day of the trial who was where within the altercation. She could only testify that one of the boys wore a light-colored shirt and the other boys wore dark-colored clothing.

Likewise, the video surveillance, which was played for the jury, is unclear enough that it could be interpreted to support either version of events. The surveillance videos show, and Johnson and Williams both testified, that Williams and Felton rode from left to right on the screen when they were overtaken by Johnson on his bike and caught up to by Brown. From there, all the parties agree, and the video confirms, that Brown, Williams, and Felton dismounted from their respective bicycles. Unfortunately, the video does not confirm how the boys came to dismount or who initiated that first contact. The video confirms that Johnson turned back after seeing the altercation begin.

Williams' self-defense theory was only applicable if the jury did not find that the altercation began because of a robbery attempt. Once the jury entered its verdict finding Williams guilty of the lesser included offense of theft, logic dictates that the jury did not believe that the altercation began because of the robbery attempt. Accordingly, the State failed to rebut Williams' theory of self-defense and the trial court improperly denied Williams' motion for a judgment of acquittal as to count one (first-degree premeditated murder) filed after the jury entered its verdict. However, viewing the evidence in a light most favorable to the State, the trial court did not err in denying the motion as to count five (attempted murder) because the evidence and testimony provided at trial demonstrated that Williams hesitated before turning to shoot Johnson. A reasonable jury could have concluded that the shot fired at Johnson was not fired in self-defense.

The second issue presented is whether Williams is entitled to resentencing pursuant to chapter 2014-220, Laws of Florida, and to resentencing pursuant to this Court's decision in *Williams v. State*, 186 So. 3d 989 (Fla. 2016). The State concedes that the answer to both these inquiries is yes. Based on the State's concession, we end our inquiry here and remand with instructions to remand to the trial court for resentencing in accordance with *Williams*, 186 So. 3d 989 and *Thomas v. State*, 40 Fla. L. Weekly S479, 2015 WL 5178605 at *1 (Fla. Sept. 4, 2015) (177 So. 3d 1275) (table).

- 10 -

It is so ordered.

PARIENTE and LEWIS, JJ., concur.
LABARGA, J., concurs in result.
CANADY, C.J., concurs in result in part and dissents in part with an opinion, in which POLSTON and LAWSON, JJ., concur.

NO MOTION FOR REHEARING WILL BE ALLOWED.

CANADY, C.J., concurring in result in part, dissenting in part.

Based on the State's concession of error, I agree that the decision of the Second District Court of Appeal should be quashed to the extent that it affirmed Williams's sentences and that the case should be remanded for resentencing in conformance with chapter 2014-220, Laws of Florida. I do not disagree with the conclusion that the Second District's decision to affirm Williams's attempted murder conviction was correct, but I believe that it is unnecessary for this Court to address the issue relating to this conviction. I dissent, however, from the decision to quash that portion of the Second District's decision that affirmed the first-degree premeditated murder conviction.

POLSTON and LAWSON, JJ., concur.

Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

   Second District - Case No. 2D14-1732

   (Hillsborough County)

Christopher E. Cosden, Fort Myers, Florida,

for Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, C. Suzanne Bechard, Bureau Chief, and Elba Caridad Martin, Assistant Attorney General, Tampa, Florida,

for Respondent