351 So.2d 972 (1977)
Nadean O. McARTHUR, Appellant,
v.
STATE of Florida, Appellee.
No. 49526.
Supreme Court of Florida.
September 30, 1977.
*973 Chester Bedell, Jacksonville, Eugene P. Spellman, Miami, and Raymond E. Ford, Fort Pierce, for appellant.
Robert L. Shevin, Atty. Gen., Tallahassee, Harry M. Hipler and Basil S. Diamond, Asst. Attys. Gen., West Palm Beach, for appellee.
ENGLAND, Justice.
By direct appeal we have before us for review the 1975 conviction of Nadean McArthur for the first degree murder of her husband, Charles McArthur. We have jurisdiction because the trial court upheld the validity of two statutes, Sections 40.01(1) and 775.082(1), Florida Statutes (1975).[1]
Appellant argues that, in addition to the two constitutionally infirm statutes, reversal of her conviction is required by six errors which occurred during her trial. After careful examination of the record, we find that five of these contentions require neither reversal nor extensive discussion.[2] *974 Appellant's constitutional challenges require more detailed analysis, but similarly do not warrant reversal.
Appellant's challenge to the jury selection statute, Section 40.01(1), Florida Statutes (1975), essentially asks that we reconsider Wilson v. State, 330 So.2d 457 (Fla. 1976), in which we sustained this statute, in light of the United States Supreme Court's decision in Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). That case held unconstitutional a Louisiana jury selection statute which operated to exclude women from jury service, since they were exempt unless requesting to serve, on the ground that the statute deprived defendants of their right to a jury selected "from a fair cross section of the community".[3] At the time of trial the Florida statute provided in relevant part that
"expectant mothers and mothers with children under eighteen years of age, upon their request, shall be exempted from grand and petit jury duty."[4]
The record fairly depicts the operation of the statute. Several mothers with children under the age of 18 were excused from jury service on the representation that hardship would be suffered if they could not be at home to care for their children. Some mothers were excused under the statute simply "upon their request", even though they held jobs outside the home and made no plea of hardship. One father asked to be excused because of the hardship to his seven motherless children if he could not earn his $110 weekly income. His request was denied by the court; however, counsel for both sides later requested that he be excused and the trial judge acceded. No expectant mothers were present to request exemption from jury duty.[5]
Since mothers with children under 18 were exonerated from jury duty simply on request, our concern is whether their absence denied defendants the opportunity to select a jury from a fair cross section of the community. We think not. The sixth amendment to the United States Constitution requires that no "large, distinctive groups are excluded from the [jury] pool".[6] This standard establishes two tests, and although the excluded group here appears sufficiently large to pass the "size of group" test, it fails what may be called the "nature of the group" test.
To evoke constitutional concern, the group excluded must be sufficiently "distinctive" to eliminate "the subtle interplay of influence" or the "distinct quality [which] is lost if either sex is excluded" *975 totally.[7] Mothers of young children are not, we believe, so distinctive a class as to evoke sixth amendment concerns. Those eligible for jury service include mothers of older children, women without children, and fathers with children of all ages. No distinctive quality of parenthood or sex is lost by the exclusion of mothers who presently have children under 18.[8] Thus, while the legislative exclusion does not require hardship and may therefore operate automatically to exempt from jury service mothers who have no more compelling need to tend young children than fathers or the parents of older children, the class excluded is not constitutionally significant.
Appellant's second constitutional challenge asserts the invalidity of Section 775.082(1), Florida Statutes (1975), which requires a person convicted of a capital felony and sentenced to life imprisonment "to serve no less than 25 years before becoming eligible for parole... ." We have already upheld this statute against an assertion that it is an impermissible legislative usurpation of executive branch powers.[9] Appellant here contends that the statute imposes a cruel and unusual punishment, since it operates without regard to the circumstances of individual defendants or the crimes for which the defendants have been convicted. The state argues that the severity of the penalty is commensurate with the severity of the crime.
This very issue was recently addressed by the Second District Court of Appeal in Quick v. State, 342 So.2d 850 (Fla. 2d DCA), aff'd per curiam, No. 51,246 (Fla. Sept. 29, 1977), in which a majority of the court upheld the statute. Judge McNulty filed a forceful dissent analogizing the situation to Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), where the United States Supreme Court ruled that a mandatory death penalty for first degree murder is cruel and unusual punishment. We believe the Quick majority was correct, for in Woodson the Court recognized that term sentencing minima are significantly different from death sentences as regards federal constitutional criteria. The Court said:
"While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.
This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long."[10] (Emphasis Supplied.)
Relevant to the same concerns under Florida's Constitution is O'Donnell v. State, 326 So.2d 4 (Fla. 1975), in which we upheld a statute imposing a mandatory minimum sentence of 30 years imprisonment for kidnapping.[11] In O'Donnell we reaffirmed the time-honored principle that any sentence *976 imposed within statutory limits will not violate Article I, Section 8 of the Florida Constitution, and the reasoning used there is persuasive here. The correlation in seriousness and potential deterrent value between a minimum 30 year sentence and the crime of kidnapping is similar to the correlation between the minimum mandatory sentence imposed by Section 775.082(1) and the palpably more serious crime of premeditated murder. All this, of course, was at the heart of Banks v. State, 342 So.2d 469 (Fla. 1976), in which we rejected the very contention which appellant now raises. We held in Banks that this statute did not impose constitutionally proscribed cruel and unusual punishment, and we now reiterate that view.
We come to appellant's last and principal contention before us, that as a matter of law there was insufficient evidence of her guilt to support her conviction. Appellant and the state agree as to the legal standard to be applied in cases where a conviction is based on circumstantial evidence,[12] as here, but they sharply disagree as to the application of that standard to the record in this case.
A review of prior decisions of this Court in similar cases[13] is not helpful to the analysis required here, since the nature and quantity of circumstantial evidence in each case is unique. Moreover, while we have examined all of the evidence in the record before us, we can see no jurisprudential value in a lengthy recitation of that evidence in this opinion. A lengthy summary will suffice.
In general, the jury received two categories of circumstantial evidence  scientific and non-scientific. Our study of both types leads us to conclude that, on balance, neither is inconsistent with innocence.[14]
The non-scientific evidence in the record, consisting of witness testimony from the funeral home owner, ambulance drivers, police *977 officials, and a local merchant,[15] is reasonably consistent with the version of events which appellant conveyed to investigating officers when they first arrived at the scene of her husband's death. She had told the officers that her husband had been concerned about her and their child's safety during his many absences, and that he had asked her to take out and check a gun which had been purchased two years before, in order to be sure she could handle it. While her husband lay in bed on his left side, she sat with the gun indian-style on the bed facing him, half on a pillow and half off. She told the officers that she had forgotten how the gun functioned and was fumbling with it, apparently while it was still inside a cloth bag. Her husband became impatient, grabbed for the gun, it went off, and he was shot in the head.
Appellant related the same outline of events to each other person who inquired as to what had occurred, except to one officer who stated that he was told the "gun fell, hit her knee, and went off". Although this officer was present at the scene of death with others who received a different explanation, no inquiry was made as to the conflict in statements, and the one officer's recitation is the only conflicting explanation in the record. Another witness to the same conversation in fact had no recollection of this statement by appellant.
All attempts by the state and by the defense to elicit from witnesses more details of appellant's statements at the time of death were unsuccessful. Based on the non-scientific conflicting evidence, we cannot accept the state's view that all reasonable hypotheses of innocence are incompatible with the record.
Both sides introduced fairly complex scientific evidence to explain or defeat appellant's hypothesis of an accidental shooting. Experts testified that it would have been possible for the gun to fire accidentally if Mr. McArthur had grabbed for the gun and any one of three alternative acts had occurred: (1) he had hit the trigger while the hammer was in a full-cocked position, (2) he had caused the hammer to be released while the gun was held partially cocked by appellant, or (3) he had hit against the hammer, pushed it to a partially cocked position and then it automatically fell back. The gun also might have fired accidentally if it had been held upside down in the bag with portions of the cloth wrapped around the hammer or trigger in a particular manner, and if Mr. McArthur had grabbed and pulled the bag. There is no evidence that the gun had been or had not been in the full-cocked position when appellant was fumbling with it.
The gun was fired at a distance of about seven inches from Mr. McArthur, which is consistent with appellant's theory that Mr. McArthur leaned forward to grab for the gun. The presence of smudge marks (cylinder flare) on the underside of one pillow shows that the gun was fired when very close to the pillow, another fact consistent with appellant's contention that she was sitting partially on the pillow, thereby causing the other half to rise slightly. (The location of these marks, we recognize, is also consistent with the state's suggestion that she was holding the gun close to the pillow when she intentionally murdered her husband.[16]) The presence of barium and antimony on Mr. McArthur's hands is consistent both with the gun having been fired intentionally while his hands were raised in a defensive posture, as the state suggests, and with the gun having fired accidentally when one of Mr. McArthur's hands hit the hammer as he braced his weight and leaned forward to grab the weapon.
*978 The angle by which the bullet entered Mr. McArthur's head, and the pattern of blood on the wall, are consistent both with his leaning forward to grab the weapon and appellant's having shot him while his head was raised at least one foot off the bed. Similarly, the pattern of blood on the pillow was consistent with appellant's version of the pillow's placement where she was sitting.[17]
From the totality of scientific and non-scientific evidence at appellant's trial, we are forced to conclude that the prosecution's proof of Mr. McArthur's intentional murder was not inconsistent with his accidental death. The jury could reasonably have concluded, and obviously did conclude, that it was more likely that appellant murdered her husband than that she did not. Yet "even though the circumstantial evidence is sufficient to suggest a probability of guilt, it is not thereby adequate to support a conviction if it is likewise consistent with a reasonable hypothesis of innocence".[18] On this record appellant's innocence has not been disproved. Only she knows the truth, and it was and is her constitutional right not to offer her explanation, her demeanor, her candor and her credibility to the jury. The state simply did not carry its burden of proof. Our jurisprudence and the justice of the cause require that the conviction entered below be reversed and that appellant, if the state so elects, be afforded a new trial.
It is so ordered.
OVERTON, C.J., and HATCHETT and KARL, JJ., concur.
BOYD, J., concurs in part and dissents in part with an opinion.
ADKINS and SUNDBERG, JJ., dissent.
BOYD, Justice, concurring in part and dissenting in part.
I concur in that part of the majority opinion quashing the murder conviction of appellant. If a new trial is to be held, the venue should be changed.
In Griffis v. Hill, 230 So.2d 143 (Fla. 1969), this Court held that whenever an appellate court concludes that a jury of reasonable people could not have reached the verdict under consideration without a mistake of law or fact, it is the duty of the court to quash the judgment. A careful review of all of the evidence in this case leads me to conclude that the quantum of proof against appellant at the trial was inadequate to prove appellant's guilt beyond and to the exclusion of any reasonable doubt.
Although some jurisdictions permit a new trial of an accused person by the government when convictions are reversed due to insufficient evidence, it is my opinion that such action constitutes double jeopardy, in contravention of the Fifth Amendment to the Constitution of the United States and Article I, Section 9 of the Florida Constitution. I therefore would dissent to that portion of the opinion requiring a new trial.
NOTES
[1] Appeal was first taken to the Fourth District Court of Appeal, but pursuant to Fla.App. Rule 2.1(a)(5)(d) that court on its own motion transferred the appeal here.
[2] First, the exclusion of lay opinion regarding appellant's emotional state immediately after her husband's death, though technically error, was not so prejudicial as to require reversal in light of other testimony which was adduced as to her conduct and statements. Second, the requested jury instruction on circumstantial evidence was generally repetitive of an instruction which was given, and though it would not have been error to give the instruction to the jury by the same token its rejection was not an abuse of the trial court's discretion. Third, the pretrial publicity which attended appellant's trial did not make it impossible to select an impartial jury as a matter of law or fact. Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Dobbert v. State, 328 So.2d 433 (Fla. 1976), aff'd, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). Fourth, the limitations placed on defense counsel's voir dire examination of prospective jurors were carefully drawn to avoid tainting the jury panel with the substance of rumors which some prospective jurors might have heard. Accord, Jones v. State, 343 So.2d 921 (Fla. 3d DCA 1977). In fact, the record quite clearly shows that the jurors were not preconditioned to find for or against appellant, and that they were able to reach their conclusions solely on the basis of the evidence presented at trial. Finally, the trial judge did not abuse his discretion by refusing to sequester the jury. Fla.R.Crim.P. 3.370(a). On the contrary, he made a careful and determined inquiry into the need for sequestration and found that the fears of defense counsel, and his own preliminary concerns, were without basis in fact.
[3] Taylor v. Louisiana, 419 U.S. at 530, 95 S.Ct. at 697.
[4] The 1975 Legislature lowered the statutory age from 18 to 15. Ch. 75-78, Laws of Florida.
[5] No suggestion is made in this case that the state lacks a justification for providing expectant mothers with an exemption. In Taylor, the Supreme Court said:

"The States are free to grant exemptions from jury service to individuals in case of special hardship or incapacity and to those engaged in particular occupations the uninterrupted performance of which is critical to the community's welfare." 419 U.S. at 534, 95 S.Ct. at 700.
See also Kahn v. Shevin, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974).
[6] Taylor v. Louisiana, 419 U.S. at 530, 95 S.Ct. at 698.
[7] Ballard v. United States, 329 U.S. 187, 193-94, 67 S.Ct. 261, 264, 91 L.Ed. 181 (1946), cited with approval in Taylor v. Louisiana, 419 U.S. at 531-532, 95 S.Ct. at 698.
[8] Although mothers of young children in contemporary society may have different attitudes or experiences than mothers of older children, our concern is a constitutional imperative. That there is an arguable sociological distinction of importance is a matter for the Legislature to consider.

"The fair-cross-section principle must have much leeway in application. The States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community."
Taylor v. Louisiana, 419 U.S. at 537-38, 95 S.Ct. at 701.
[9] Owens v. State, 316 So.2d 537 (Fla. 1975); Dorminey v. State, 314 So.2d 134 (Fla. 1975).
[10] Woodson v. North Carolina, 428 U.S. 283, 304, 96 S.Ct. 2978, 2991-92, 49 L.Ed.2d 944, 961 (1976).
[11] § 775.082(4)(a), Fla. Stat. (1973).
[12] Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. Davis v. State, 90 So.2d 629 (Fla. 1956); Mayo v. State, 71 So.2d 899 (Fla. 1954); Head v. State, 62 So.2d 41 (Fla. 1952). (The meaning of "not inconsistent" may be sufficiently different from "consistent" as to prevent a substitution of terms.) In applying the standard, the version of events related by the defense must be believed if the circumstances do not show that version to be false. Mayo v. State, above; Holton v. State, 87 Fla. 65, 99 So. 244 (1924).
[13] This case is not similar to those in which a particular circumstance is consistent only with one conclusion. In Davis v. State, n. 12 above, for example, the state's own witness in a murder trial placed the time of the victim's death at a time when the accused was assisting law enforcement officers in a search for the victim. In Dewey v. State, 135 Fla. 443, 186 So. 224 (1938), the accused's pretrial story that his wife's death was caused by a single self-inflicted gunshot was totally discredited by proof that two shots had been fired. Nor is this case in any way similar to those in which the only hypothesis of innocence is wholly incredible. In Kersey v. State, 73 Fla. 832, 74 So. 983 (1917), for example, the only hypothesis of innocence was a suicide so bizarre in contrivance as to be inherently unbelievable.
[14] Minor inconsistencies between appellant's statements and acts at the scene of the death and the proof relied upon by the state to evidence appellant's guilt create ambiguities in the tenor of proof, at best. Two examples will indicate the nature of these inconsistencies. Evidence was adduced regarding appellant's emotional state following the shooting. That evidence is consistent both with the state's theory that she was a calm murderess, calculating how to conceal her guilt, and with the defense's theory that she was in a state of shock. The state also presented evidence that appellant did not wait on her front doorstep for the ambulance to arrive and that she made coffee for the ambulance driver when he requested it. Both alone and with other facts, however, the damning effect of this evidence can be classed as ambiguous, if not explainable. The state, of course, draws from these bare facts a behavioral sketch of calm calculation, consistent with cold-blooded murder. The defense would explain them as being a product of shock. The defense also contradicted the adverse implication of the coffee facts by the testimony of the operator of the ambulance service who received Mrs. McArthur's call for assistance. The operator testified she had told appellant not to go into the bedroom where her husband's body lay, but rather "to go out to the kitchen and be busy making coffee, do something and our attendant would be there in a few minutes."
[15] Appellant herself did not testify at the trial.
[16] The prosecution took conflicting positions on this point before the trial court and jury. In closing argument the prosecution theorized that appellant held the pillow over the gun when she murdered her husband in order to muffle the sound, but when the defense attempted to elicit expert testimony that the pillow could not have been wrapped over the gun without causing "double" cylinder flare marks, the state conceded to the trial judge that the first theory was untenable. As a consequence the expert was allowed to testify that the pillow could not have been held over the gun.
[17] The evidence is uncontradicted that the pillow was moved at least once before police photographed the scene, so it became impossible to prove how the pillow was positioned at the time the gun was fired. However, the bloodstains and tissue on the pillow indicate that, at least very shortly after the shot, the pillow was positioned where appellant said it had been. The state argued to the jury that appellant moved the pillow to the place on the bed where it was found when the police photographed the scene. This suggested a theory itself inconsistent with her guilt because it assumed a murderess would rearrange physical evidence so that it would be inconsistent with her story. Obviously, no inference relevant to appellant's guilt can be drawn from the fact that the pillow may have been negligently moved by one of the police officers or one of the ambulance attendants.
[18] Davis v. State, n. 12 above at 632.