ZEHMER, C.J.
(Dissenting).
After carefully reviewing the voluminous record in this case, I am unable to agree with the majority that the state has proved the charge of first degree premeditated murder by legally sufficient circumstantial evidence. The state’s theory of events said to prove that Appellant Wiled her husband with premeditation is, in my view, inherently incredible and requires the fact-finder to impermis-sibly pyramid inference upon inference.
I.
Appellant and her husband, Raddie Lord, were employees of the Department of Corrections. Appellant was charged with first degree murder arising out of the shooting of her husband on October 4, 1988. According to the state, at the time of his death just before eight in the morning, Mr. Lord was asleep in his bed with his head on a pillow and his body covered by thick bed covers. The window shades were drawn and the bedroom was dark. The state hypothesizes that Appellant assumed a kneeling position in the small space between the bed and the wall and fired a 12-gauge shotgun loaded with number 6 bird shot through the bed covers into Mr. Lord’s lower back at an angle she then knew would cause the shot to traverse up her husband’s body through vital organs to his heart and result in his death. The state infers the required premeditation from the fact that Appellant assumed a kneeling position to fire the gun because this act, it is argued, required reflection by Appellant to get her body in the proper position to fire the fatal shot. Mr. Lord died as a result of the single shot that inflicted the wound.
Appellant contends, on the other hand, that the shotgun had been lying upright against the wall next to the bed and, as she was moving through this space in an attempt to retrieve some money from the top of the dresser, she dislodged the gun and grabbed it to prevent it from falling, when it accidentally discharged.
The state counters that Appellant’s explanation is repudiated by circumstantial evidence that shows her explanation is impossible and thus does not supply an acceptable hypothesis of innocence. This contention rests primarily on the state’s expert testimony that the gun had to be held parallel to the floor when it fired to cause the trajectory and resulting wounds. Having thus repudiated Appellant’s hypothesis of innocence, the state argues, the only reasonable hypothesis for-the shooting is that Appellant intentionally murdered her husband with premeditation, as her motive was to obtain the proceeds of a large insurance policy on his life.
In the jury trial, the state introduced evidence of examinations made by firearms experts and the medical examiner, and testimony by insurance company representatives, to prove its theory of the case. The state’s proof, construed in the light most favorable to the prosecution, established that at about 8:04 a.m., on October 4, 1988, Sheriff Glen Dyals received a telephone call from Appellant, who stated to him: “Glen, I shot Rad-die. The gun went off and hit Raddie.” When Sheriff Dyals and other officials arrived at the Lords’ residence a short time later, members of Appellant’s family already present directed the officers to a back bedroom. When the officers entered the bedroom, they observed Mr. Lord’s body lying on a bed on his right side, with the covers pulled back to reveal a gunshot wound in the lower left portion of his back. They observed various items in the room, including a shotgun lying between the bed and the wall near a dresser. Shoes and slippers were also on the floor in that area. The bed covers had been pulled down after the shooting to reveal Mr. Lord’s back and the entry wound. After the officers secured the scene in preparation for the arrival of FDLE’s mobile crime lab, Officer Pinner questioned Appellant about the events that had transpired.
*821 Appellant gave Pinner several statements. In the first statement given that morning she explained that, alter having sent their children to school and leaving Mr. Lord asleep in their bed, she went to her car to drive to work. Realizing that she had left her lunch money on the dresser, she returned to the bedroom where Mr. Lord was sleeping. The room was dark because the windows were covered by drapes. She walked in the narrow space between the bed and wall and reached toward the chest of drawers to get the money, but instead knocked off either a notebook or a glass. When she reached to catch this item, the gun went off in the room. In another interview held later that day, Appellant stated that the previous night Mr. Lord had left the house through the back door to investigate why the dogs were barking outside. Mr. Lord probably took the shotgun that she had loaded sometime earlier and, upon returning, carelessly left the gun lying next to the wall beside the bed near the gun cabinet. In her testimony before the grand jury several weeks later, given after she had obtained professional help for amnesia regarding the events on the morning in question (see discussion at note 5, infra), Appellant stated that when she reached for her lunch money on the dresser, she knocked a notebook off the dresser. She then reached to grab the notebook, turned around to go back out, and walked toward the end of the bed. She stumbled over a boot or something, kicked the item with her foot, and then saw or heard the gun sliding. She reached over to grab it, Mr. Lord moved in the bed, and the gun went off.
Nancy Davis, a friend of the Lords who lived nearby, testified for the state that on the morning of Mr. Lord’s death she received a telephone call from Appellant, who sounded hysterical and asked Ms. Davis to come to the Lords’ residence. When Ms. Davis arrived at the residence and entered the bedroom, she saw Mr. Lord lying on the bed on his right side and Appellant up on top of him, holding him from the front and rocking him. The rocking did not cause Mr. Lord’s body to move from the place on the bed where it was then lying. Ms. Davis asked what happened, and Appellant stated that the gun went off and shot Raddie in the back. Davis went around to look at the wound and touched Mr. Lord’s arm, which was warm. Davis did not realize that Mr. Lord was dead and thought that he was in shock until she looked at his face and saw that his eyes were open. About 5 to 7 minutes later, Appellant’s parents arrived, followed by paramedics some minutes later.
Dr. Floro, the medical examiner, testified to the results of the autopsy he performed. He stated that Mr. Lord was 5 feet 6 inches tall[1] and weighed 223 pounds; that he died instantly from a shotgun wound; that the entry wound measured 4 centimeters by 3 centimeters and was located in his left lower back approximately 10 inches from his right side, where the main group of pellets entered; that the shot had entered Mr. Lord’s body at an angle (about 45 degrees from the surface of Mr. Lord’s back) and followed a trajectory upward toward the chest parallel to the backbone; that none of the pellets exited the body; that the spread of pellets went left and into the medial part of the left chest after passing through organs in the abdomen, and went toward the head; that the distance between the wound and the gun was possibly 3 to 4 feet, more or less; and that the gun was fired at an angle to the body. He then proceeded to state his opinion that the shooting could not have occurred accidentally as described by Appellant in her statements.
David Williams, an FDLE crime laboratory analyst, testified that his measurements and tests indicated that when fired, the shot gun would have been “more or less level” or on a horizontal plane (parallel to the floor), more or less straight into Mr. Lord’s back. He testified that when the gun was fired, its muzzle or barrel was about one inch above the dark area caused by a powder burn on the bedspread and about a foot from the hole in the bedspread, with some additional distance between the bedspread and the wound in Mr. Lord’s back; and that the absence of gunpowder residue on objects other than the bedspread indicated that when the shot was fired, the bedspread was covering Mr. Lord, *822 who was lying on a pillow. (The position of the bed spread on Lord’s body was obviously reconstructed by the witness since the bed covers had been removed from the body before any investigators arrived). Williams further testified that it was necessary to push against the trigger with 5½ pounds of force in order to fire the gun.[2] On cross-examination, Williams testified that his tests did not consider any rotation or rolling back of Mr. Lord’s body prior to the discharge of the weapon, but instead considered Mr. Lord to be lying in the manner and exact position depicted in the photographs taken by investigators; there was some discrepancy regarding medical examiner Dr. Floro’s opinion about the distance of the gun from the wound, which Dr. Floro estimated at 8 to 4 feet, and Williams estimated at a little over a foot; and if the gun had gone backward or to the side after it discharged, there was no way to determine whether the butt of the gun landed on a pair of slippers located near the shoes on the floor. Williams further testified that the end of the gun’s barrel could not have been on the bed when it fired because of the location of a pillow behind Mr. Lord’s back; “[i]t had to have been up above and over — I don’t remember what the measurement was, but a foot away from his body.”[3] He then proceeded to express his opinion that an accidental shooting could not have occurred as Appellant described.
James Gettemy, an FDLE employee, testified about measurements he made on the assumption that the position of Lord’s body on the bed when shot was the same as when he made these measurements. His measurements indicated that: the distance from the bed to the wall near where the shotgun was found was 42 inches; the distance from the floor to the top of the bed was 22½ inches; the distance from the center of Mr. Lord’s left hip to the edge of the bed was about 22 inches; and the distance between the end stock of the gun and the wall adjacent to where the shotgun was found was 12 inches. On cross-examination, Gettemy testified that blood was found on the bed beneath Mr. Lord’s body and that one of the photographs depicted blood running from the wound, but no bloodstains were found on the pillow that was behind Mr. Lord’s back when he took these measurements.
This evidence was received during the state’s ease-in-chief. Appellant then testified on her own behalf and presented expert opinion testimony to explain that the gun, rather than being parallel to the floor, was at an upward angle with the gun butt nearer the floor when it fired, and this was consistent with her contention that the gun was accidentally discharged when she grabbed for it.
II.
Because the state’s evidence of guilt was circumstantial only in respect to critical elements of the offense, certain principles of law applicable in circumstantial evidence eases govern review of the sufficiency of the state’s evidence in this case. In Weeks v. State, 492 So.2d 719 (Fla. 1st DCA 1986), rev. dismissed, 503 So.2d 328 (Fla.1987), we described an appellate court’s function on review of the sufficiency of circumstantial evidence in a criminal case:
While the credibility of witnesses and the weight of the evidence are matters which are properly left solely to the trier of fact, it is the court’s function to determine whether the evidence was legally sufficient to support the guilty verdict. Chaudoin v. State, 362 So.2d 398 (Fla. 2nd DCA 1978); Williams v. State, 206 So.2d 446 (Fla. 4th DCA 1968).
492 So.2d at 721. Finding that the state’s circumstantial evidence required the jury to *823 impermissibly pyramid inferences in that case, we observed that, “[c]ircumstantial evidence is not sufficient when it requires such pyramiding of inferences in order to arrive at a conclusion of guilt. Chaudoin v. State, supra at 402; Gustine v. State, 86 Fla. 24, 97 So. 207 (1923).” 492 So.2d at 722. Similarly, reversing a conviction based on circumstantial evidence in Keys v. State, 606 So.2d 669 (Fla. 1st DCA 1992), we explained the legal principles underlying the prohibition on pyramiding inferences:
Florida courts have long adhered to the rule proscribing the fact-finder from basing an inference upon an inference in order to arrive at a conclusion of fact. See Chestnut v. Robinson, 85 Fla. 87, 95 So. 428 (1923); Mutual Life Ins. Co. v. Johnson, 122 Fla. 567, 166 So. 442 (1935); Voelker v. Combined Ins. Co. of America, 73 So.2d 403 (Fla.1954); Sirmons v. Pittman, 138 So.2d 765 (Fla. 1st DCA 1962). The purpose of this rule is to protect against verdicts or judgments based upon speculation. Voelker v. Combined Ins. Co. of America, 73 So.2d at 407. See also Sirmons v. Pittman, 138 So.2d 765, 771 (An inference recognizable in law cannot be based upon evidence that is so uncertain or speculative as to raise merely a conjecture or possibility.) In criminal cases, the rule has been stated thusly:
Where two or more inferences in regard to the existence of criminal intent and criminal acts must be drawn from the evidence and then pyramided to prove the offense charged, the evidence lacks the conclusive nature to support the conviction.
Collins v. State, 438 So.2d 1036 (Fla. 2d DCA 1983). See also Weeks v. State, 492 So.2d 719 ([Fla.] 1st DCA 1986), rev. dismissed, 503 So.2d 328 (Fla.1987) (Circumstantial evidence is not sufficient when it requires pyramiding of inferences to arrive at a conclusion of guilt.). An exception to the rule has been recognized where the basic inference is established to the exclusion of any other reasonable inference or theory. Voelker v. Combined Ins. Co. of America, 73 So.2d 403, 407. Thus, if no reasonable inference contrary to the base inference may be indulged, the base inference may be elevated to the dignity of an established fact for the purpose of drawing further inferences. Franklin v. Dade County, 230 So.2d 730 (Fla. 3d DCA), cert. denied, 237 So.2d 761 (Fla.1970). See also Busbee v. Quarrier, 172 So.2d 17 (Fla. 1st DCA), cert. denied, 177 So.2d 474 (Fla.1965) (“It is well established in this jurisdiction that when circumstantial evidence is relied on in a civil case, the particular inference relied on to establish the fact must outweigh all contrary inferences to such an extent as to amount to a preponderance of all reasonable inferences that might be drawn from the same circumstances.”); Gaidymowicz v. Winn-Dixie Stores, Inc., 371 So.2d 212 (Fla. 3d DCA 1979) (To use one inference as a basis for another inference, the first inference must outweigh all reasonable inferences to the contrary.).
606 So.2d at 673.
In McArthur v. State, 351 So.2d 972 (Fla.1977), the supreme court reversed a conviction of first degree premeditated murder for insufficiency of the circumstantial evidence to prove the charged offense, explaining:
Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. Davis v. State, 90 So.2d 629 (Fla.1956); Mayo v. State, 71 So.2d 899 (Fla.1954); Head v. State, 62 So.2d 41 (Fla.1952). (The meaning of “not inconsistent” may be sufficiently different from “consistent” as to prevent a substitution of terms.) In applying the standard, the version of events related by the defense must be believed if the circumstances do not show that version to be false. Mayo v. State, above; Holton v. State, 87 Fla. 65, 99 So. 244 (1924).
351 So.2d at 976 n. 12. More recently, in Golden v. State, 629 So.2d 109 (Fla.1993), the supreme court reiterated:
Moreover, when circumstantial evidence is used to prove the corpus delicti, “it must be established by the most convincing, satisfactory and unequivocal proof compatible *824 with the nature of the case, excluding all uncertainty or doubt.” Lee [v. State], 96 Fla. [59] at 65, 117 So. [699] at 702 [(1928)]; Davis v. State, 90 So.2d 629 (Fla.1956); Deiterle v. State, 101 Fla. 79, 134 So. 42 (1931). By its very nature, circumstantial evidence is subject to varying interpretations. It must, therefore, be sufficient to negate all reasonable defense hypotheses as to cause of death and show beyond a reasonable doubt that the death was caused by the criminal agency of another person. See State v. Law, 559 So.2d 187 (Fla.1989); McArthur v. State, 351 So.2d 972 (Fla.1977).
629 So.2d at 111.
In State v. Law, 559 So.2d 187 (Fla.1989), the supreme court described the respective roles of the judge and jury in circumstantial evidence eases when the trial court is presented with a motion for judgment of acquittal:
Upon careful consideration, we find that the view expressed in Lynch [v. State, 293 So.2d 44 (Fla.1974)] and that expressed by the district court below in the instant case and in Fowler [v. State, 492 So.2d 1344 (Fla. 1st DCA 1986), rev. denied, 503 So.2d 328 (Fla.1987)] are harmonious. A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. See Wilson v. State, 493 So.2d 1019, 1022 (Fla.1986). Consistent with the standard set forth in Lynch, if the state does not offer evidence which is inconsistent with the defendant’s hypothesis, “the evidence [would be] such that no view which the jury may lawfully take of it favorable to the [state] can be sustained under the law.” 293 So.2d at 45. The state’s evidence would be as a matter of law “insufficient to warrant a conviction.” Fla.R.Crim.P. 3.380.
It is the trial judge’s proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state. Spinkellink v. State, 313 So.2d 666, 670 (Fla.1975), cert. denied, 428 U.S. 911, 96 S.Ct. 3227, 49 L.Ed.2d 1221 (1976). The state is not required to “rebut conclusively every possible variation” [State v. Allen, 335 So.2d 823, 826 (Fla.1976)] of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant’s theory of events. See Toole v. State, 472 So.2d 1174, 1176 (Fla.1985). Once that threshold burden is met, it becomes the jury’s duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.
If the rule were not applied in this manner, a trial judge would be required to send a case to the jury even where no evidence contradicting the defendant’s theory of innocence was present, only for a verdict of guilty to be reversed on direct appeal. We agree with the Fowler court that
it is for the court to determine, as a threshold matter, whether the state has been able to produce competent, substantial evidence to contradict the defendant’s story. If the state fails in this initial burden, then it is the court’s duty to grant a judgment of acquittal to the defendant as to the charged offense, as well as any lesser-included offenses not supported by the evidence- Otherwise, there would be no function or role for the courts in reviewing circumstantial evidence, as was statéd so well in Davis v. State, 436 So.2d [196 (Fla. 4th DCA 1983)], 200: “If we were to follow the state’s logic, a trial judge could never ... grant a motion for judgment of acquittal pursuant to Florida Rule of Criminal Procedure 3.380 when the evidence [is] circumstantial. Instead, every case would have to go to the jury.”
Fowler, 492 So.2d at 1347.
559 So.2d at 188-89.
The cited decisions make it abundantly clear that Appellant’s motion for judgment of acquittal should have been denied only if the circumstantial evidence presented in the state’s case-in-chief to prove the elements of *825 premeditated first degree murder was inconsistent with any reasonable hypothesis of innocence offered by Appellant, and only if such evidence was legally competent in the sense that it was not based on an illegal pyramiding of inferences.
In reviewing the sufficiency of the state’s proof in light of these principles, the required analysis is twofold. First, it is necessary to analyze the legal sufficiency of the evidence presented before Appellant moved for judgment of acquittal at the close of the state’s case[4] because the state cannot rely on evidence admitted in the defendant’s case to supply missing elements in its initial presentation. State v. Pennington, 534 So.2d 393 (Fla.1988); T.S.J. v. State, 605 So.2d 1338, 1339 n. 1 (Fla. 5th DCA 1992). Second, if it appears that the state presented legally sufficient circumstantial evidence in its initial presentation to establish a prima facie case, then the evidence as a whole must be analyzed to determine whether it excludes every reasonable hypothesis of innocence asserted by the defendant. In performing each of these analyses, the evidence must be construed in a light most favorable to the state; but the court also is required to accept the defendant’s [Appellant’s] version of events as true unless that version is shown to be false by legally competent evidence. McArthur. Moreover, I find applicable to this case the supreme court’s observation in McArthur that:
A review of prior decisions of this Court in similar cases is not helpful to the analysis required here, since the nature and quantity of circumstantial evidence in each case is unique. Moreover, while we have examined all of the evidence in the record before us, we can see no jurisprudential value in a lengthy recitation of that evidence in this opinion....
351 So.2d at 976 (footnote omitted).
III.
While Appellant conceded shooting her husband by stating “I shot Raddie” to Sheriff Ryals, there was no direct evidence showing how the shooting occurred other than Appellant’s insistence on an accidental shooting. Hence, the state’s case rests entirely on the theory that since Appellant admits she shot her husband, and since her various explanations of an accidental shooting are materially inconsistent and physically impossible, her explanations do not present a reasonable hypothesis of innocence in light of the physical facts and reconstructive opinion testimony by the state’s expert witnesses; accordingly, the jury was authorized to infer that Appellant must have intentionally shot her husband with premeditation. More precisely, the state theorizes that Appellant committed the charged offense in the following manner: while in the 42-ineh space between the bed and the wall, Appellant assumed a kneeling position for firing the shotgun, as she had been taught in her training as a state corrections officer; she placed the butt of the 45½-inch long shotgun to her shoulder and, although the room was darkened by the drawn drapes, she carefully aimed the gun at her husband’s back then covered by the bed covers; she planned the trajectory of the blast to cause the number 6 bird shot pellets to enter his low back and follow a path upwards through Mr. Lord’s body to his heart, knowing this would kill him based on her knowledge of anatomy and physiology gained during her training as an emergency medical technician; she intentionally pulled the trigger to shoot her husband; and the fact that she assumed a kneeling position “indicates a state of mind consistent solely with premeditation, for it required reflection for Mrs. Lord to position herself to fire the fatal shot.”
Absolutely critical to the state’s theory of the shooting is the fact that the gun had to be held in a horizontal position, that is, parallel to the floor and just above the surface of the bed covers when it was fired; for that fact is the only foundational fact for inferring that Appellant intentionally assumed a kneeling position, the essential predicate fact for inferring premeditation and contradicting appellant’s theory of an accidental discharge *826 with the gun butt nearer the floor. The state’s hypothesis of guilt is built exclusively on expert testimony purporting to reconstruct the shooting based on certain observations, measurements, assumptions, and photographs taken at the scene shortly after the investigators arrived. To find the ultimate fact that Appellant intentionally murdered her husband with premeditation, the following pyramid of inferences must be constructed:
1. The state’s theory begins with the foundational fact that when Mr. Lord was shot and killed, his body was lying in the same precise position and angle on the bed the investigators found when they arrived at the scene and took the photographs and measurements put in evidence.
2. Based on this position and angle of the body, and on the pattern of shot from the entry wound through the deceased’s body to the heart, it is inferred that the shot entered Mr. Lord’s lower back at an angle of 45 degrees to the spine pursuant to a trajectory that was horizontal, that is, parallel with the surface of the floor.
3. For the shot to follow this trajectory, it is inferred that the shotgun had to be held, with reference to the body, at the same 45-degree angle parallel to the floor somewhere between the 22½ inches measured from the floor to the top of the bed and the 10 inches measured from Mr. Lord’s entry wound to the surface of the bed.
4. From these facts it is further inferred that the gun had to be intentionally held in the inferred horizontal position while Appellant was in a kneeling position because that is the only way the gun could have been accurately fired to achieve the hypothesized trajectory so close to the floor.
5. The state’s theory further infers that Appellant knew precisely where to aim the gun to hit Mr. Lord’s vital organs by reason of her training as an emergency medical technician (although the record does not contain any description of what she was taught in such training).
6. The state finally infers that Appellant carefully aimed the gun at Mr. Lord’s back with premeditated intent to kill him and intentionally pulled the trigger with her finger.
IV.
At the outset, I am unable to accept the state’s hypothesis of guilt as a reasonable and plausible explanation of how this shooting must have occurred. For Appellant to intentionally accomplish the described shooting in a dark room with a single blast of bird shot while the victim’s back was concealed under thick bed covers defies imagination. The state has never explained, either in its argument to the jury or in its brief in this court, how Appellant could see well enough in the darkness of the bed room to know what portion of the bed covers she should aim at to achieve the trajectory required to kill her husband with a single shot of number six bird pellets.
The state’s theory of the shooting requires the jury to draw a series of inferred facts, each budding or pyramiding upon the other. To reach a finding of guilty based on the evidence adduced in the state’s case-in-chief, the jury was required to: (1) infer from the conditions observed after investigators arrived on the scene that the precise position and angle of the body had not changed at all after the shooting, and that the body position and angle when the shot entered the body was precisely as described by the state’s experts and shown in the photographs; (2) infer, based on this inferred position of the body, that the position and angle of the gun when fired was as described by the state’s experts; (3) infer, based on the inferred position of the gun when fired, that Appellant must have knelt, aimed and intentionally fired the gun from the kneeling position; and (4) infer, based on these inferred facts, that Appellant intentionally assumed the inferred kneeling position with premeditated intent to kill her husband. It is my view that the rule against pyramiding inferences renders the state’s proof legally insufficient to prove the charged offense as each predicate or foundational fact necessary to support an inferred fact was not conclusively established to the exclusion of all other reasonable inferences.
The state’s experts assumed (inferred) during their investigation and in their opin *827 ion testimony at trial that Mr. Lord’s body when shot was in the same precise position and angle on the bed as that found when the investigators arrived at the scene and took photographs. It is perfectly obvious, however, that if the state’s evidence permitted of a reasonable inference that the actual angle or position of the body when the shot was fired could have been different from that assumed by the state’s experts, it necessarily follows that the inferred position and angle of the gun with reference to the body and the floor would likewise be different firom that hypothesized by the state’s experts. In that event, the state’s evidence could not contradict or repudiate Appellant’s hypothesis that the gun accidentally discharged when she grabbed for it with the butt closer to the floor. Yet the state presented no evidence to prove, much less conclusively establish, that the position of the body on the bed when the gun fired had not changed position before the investigators arrived. Although the state’s expert opined that the position of the body on the bed was consistent with several physical facts found during their investigation— such as blood stains on the sheets and the pattern and trajectory of the bird shot within and outside the body, etc. — neither their testimony nor the physical facts in evidence established that the angle of the body had not been changed between the shooting and the arrival of the investigators.
For example, Dr. Floro testified for the state that the body did not move after it was shot and that the pattern of the shot in the body and the blood on the bed were inconsistent with the body having rolled over and rolled back; but on cross-examination he further explained that when he said Mr. Lord’s body did not move after it was shot, he meant that it did not slide forward or backward on the surface of the bed. In other words, the body did not move across the surface of the sheet where it lay, but it could have rolled in a different position. Further, Dr. Floro conceded that it was possible that the body moved because nothing indicated otherwise and that, if Mr. Lord had rotated slightly to see what the noise behind him was (as contended by Appellant), he could have rolled back over slightly from the force of the impact. Likewise, the state’s expert witness Williams testified that his tests did not consider any rotation or rolling back of Mr. Lord’s body prior to the discharge of the weapon. Yet he presented no evidence to demonstrate that the body angle was not changed between the time of the shooting and the arrival of the investigators.
Moreover, the state’s expert Williams testified that he assumed the shot from the gun went over the pillow found behind Mr. Lord’s back when he arrived, and that he relied heavily on this fact in reaching his opinion that Appellant’s explanation of the shooting with the gun at a lower position in respect to the floor was implausible. In his testimony, Williams inferred (assumed) that the pillow was in the position shown in the photographs, and that this position of the pillow served as the predicate fact for his further inference that the shotgun must at least have been horizontal (parallel to the bed) in order to fire over the pillow. Yet, apart from the fact that the pillow was observed in that position after someone had removed the bed covers from Mr. Lord’s back, the state’s evidence wholly failed to establish that the pillow was in that position before the covers were moved or when the gun fired. Nor was any attempt made to explain why Mr. Lord would sleep with a pillow in that unusual position. In short, this record is wholly lacking in evidence to establish that the body and pillow were not moved or changed after the shooting and before the state’s investigators arrived on scene. Hence, these facts were not conclusively established and cannot serve as the predicate facts for inferring the position of the gun and trajectory of the shotgun blast.
On the other hand, the record contains evidence placed before the jury during the state’s case that Mr. Lord’s body rolled over to the left just prior to the shooting and, further, that his body was moved between the time Mr. Lord was shot and the investigators arrived. In Appellant’s statements read into evidence during the state’s ease-in-ehief, she stated that her husband turned back towards her (rolled to his left) just before the gun went off, and that the body position in the photographs did not accurately depict its position when the gun fired. *828 Appellant’s friend, Nancy Davis, who was at the scene before law enforcement personnel arrived, testified during the state’s case that when she first observed Mr. Lord, he was lying on the bed on his right side, and that Appellant, who had been crying hysterically, was on top of him, holding him with her arms and rocking him. Although Ms. Davis testified that she did not see the body move from where it was then lying in the bed, her testimony did not rule out that the rocking motion she observed had changed the angle of Mr. Lord’s back in reference to the horizontal plane of the floor. Ms. Davis further testified that when she was subpoenaed to appear before the grand jury, Appellant came to her house and told her “that if they didn’t say anything about her mother to not say anything about her, because she [the mother] had moved the body also.” The state made no attempt to impeach or contradict this testimony from its own witness. During the defense case, Appellant’s mother testified that she arrived shortly after the shooting and that Mr. Lord’s body was in a different position than that shown in the photographs taken by the investigators at a later time. In particular, on that morning she saw Mr. Lord with one arm bent under his head, but the photograph shows both arms sticking out; she saw almost all of Mr. Lord’s face that morning, but the photograph shows his face pushed down into the pillow; and she was unable to see the wound that morning because the bedspread was covering him, but the photograph shows the wound exposed. There was no attempt to impeach or contradict the mother’s testimony with respect to these matters.
The rule is well settled in this state that unimpeaehed or undisputed testimony by a competent witness cannot be disregarded by the fact-finder unless it is inherently improbable on its face. See Flowers v. State, 106 Fla. 686, 143 So. 612 (1932); Brannen v. State, 94 Fla. 656, 114 So. 429 (1927); Holton v. State, 87 Fla. 65, 99 So. 244 (1924); Harris v. State, 104 So.2d 739 (Fla. 2d DCA 1958). See also State Farm Mut. Auto. Ins. Co. v. Orr, 660 So.2d 1061 (Fla. 4th DCA 1995); Roach v. CSX Transp., Inc., 598 So.2d 246 (Fla. 1st DCA 1992); Florida East Coast Ry. v. Michini, 139 So.2d 452 (Fla. 2d DCA 1962). “The legal effect of competent evidence which is not impeached, discredited or controverted is a question of law. Holton v. State, 87 Fla. 65, 99 So. 244; Brannen v. State, 94 Fla. 656, 114 So. 429.” Harris, 104 So.2d at 744. The undisputed testimony of Nancy Davis and Appellant’s mother established that body had been moved after the shooting and could not legally be disregarded in determining the state of the proof on that issue.
Therefore, I submit that it could be reasonably inferred from the evidence: that Mr. Lord’s body was not in the position and angle shown in the photographs and assumed by the state’s experts in reconstructing the event to prove the state’s theory of events: that the rocking motion of the body changed the position and angle of Mr. Lord’s back in reference to the horizontal plane and the floor, which in turn would alter the assumed angle and position of the gun in respect to the floor when the shot discharged; that a different position and angle of the body rolled to the left is inconsistent with, and thus does not support, the state’s hypothesis; and that if the gun discharged with the body in the different position and angle described, the butt of the gun could have been closer to the floor and still have made the trajectory of shot through the body, as contended by Appellant’s expert.
Since the state’s hypothesis of guilt was necessarily based on the inferred position of the gun at the time it was fired, which in turn was based on the inferred position and angle of the body, obviously if the body was not in the position assumed by the state’s experts, but instead had rolled slightly to the left as contended by Appellant, then the asserted position and angle of the gun so critical to the state’s theory of events is not proved by legally sufficient evidence. If Appellant grabbed the gun and accidentally hit the trigger, as she contended, the gun barrel could well have been less than horizontal, with the butt closer to the floor, when it accidentally discharged into Mr. Lord’s back. I note and agree with the trial judge’s comment, made during argument over an objection to some of this testimony, that “the evidence [as to the angles] is fairly debata *829 ble” and is “susceptible to more than one interpretation.” The state points to the absence of damage to the wall that would be expected from the recoil of the gun if it had accidentally fired as suggested by Appellant, contending that this fact means the gun was firmly in Appellant’s grasp when it fired; but the state’s experts could not rule out the fact that the gun hit the soft slippers on the floor near where it was found due to recoil. This, as argued by Appellant, would explain the absence of damage to the wall or floor.
In short, the circumstantial evidence as to the position of the body and the gun when it was fired does not exclude a reasonable inference that the shooting could have occurred as hypothesized by Appellant. The state’s experts’ opinions of how the shooting occurred were predicated on circumstantial evidence that required them to impermissibly pyramid inferences in arriving at the critical foundational or predicate facts.
I am aware that generally speaking, “[t]he bar against building an ‘inference on an inference’ is not applicable to preclude an expert’s testimony based on reasonable inferences drawn from the evidence.” Ehrhardt, Florida Evidence, § 704.1 n. 2 (1994 Ed.). However, that exception applies only to the ultimate inferences of fact being expressed by the expert as opinion; it does not apply to allow the predicate facts for the opinion to be established by impermissibly pyramiding inferences. See LaBarbera v. Millan Builders, Inc., 191 So.2d 619 (Fla. 1st DCA 1966). An expert is not permitted to express an opinion based on circumstantial evidence that does not establish the predicate facts to the exclusion of other reasonable inferences. Ruth v. State, 610 So.2d 9 (Fla. 2d DCA 1992). Hence, this exception to the general rule does not excuse the party offering the expert’s testimony from proving by competent evidence the factual basis of the opinion when it is challenged. Id. In my view, when the predicate facts for the expert’s opinion depend on one of several inferences that may be drawn from circumstantial evidence, such facts must be conclusively shown by competent evidence to avoid the prohibition on pyramiding inferences.
Moreover, other aspects of the state’s evidence was as supportive of Appellant’s innocence as it was of guilt. For example, Appellant’s hysterical emotional state when Nancy Davis first arrived is consistent with her innocence of an intentional, premeditated shooting. The notebook and glass that Appellant said she knocked off the dresser were found on the floor nearby. One of the state’s expert witnesses testified that if the shotgun was intentionally fired by pulling the trigger with the finger, he should have been able to lift an identifiable latent fingerprint from the trigger of the shotgun; but no latent prints could be lifted and identified on the trigger of the shotgun involved. This fact is plainly consistent with Appellant’s explanation that the gun discharged accidentally when she grabbed for it, and is inconsistent with the state’s theory that she intentionally put the gun to her shoulder and pulled the trigger.
The most significant fact relied on in the state’s argument to the jury was Appellant’s statement to Sheriff Dyals that “Glen, I shot Raddie. The gun went off and hit Raddie.” During final argument, the prosecutor repeatedly referred to this statement as an admission of guilt (it is found on nearly every page of the transcript of the prosecutor’s argument). While the statement that “I shot Raddie” does establish that Appellant caused the gun to discharge, her statement that “the gun went off and hit Raddie” is consistent with her contention that the shooting was accidental. This is especially true when considered in context with Nancy Davis’s testimony that Appellant was hysterical immediately after the shooting.
The state’s brief argues that the several statements given by Appellant are sufficiently inconsistent and contradictory regarding the events on the morning of the shooting to repudiate her hypothesis of innocence and serve as substantive proof of guilt. The state argues that Appellant first stated that the gun went off on its own, then later testified to the grand jury that the gun discharged when she grabbed it while it was sliding down the wall, but she could not remember whether her thumb or finger hit the trigger; and later at trial Appellant was unable to remember any details of the shoot- *830 mg. The state contends that Appellant was deliberately withholding information from the authorities when she gave these statements and that this fact will support an inference of guilt.[5] After careful review of this record, I cannot agree that the inconsistencies in Appellant’s statements are so self-contradicting that they could legally serve as substantive proof “from which the jury could have inferred guilt,” as the state contends. On the contrary, the minor inconsistencies in Appellant’s statements were no more probative than those rejected by the supreme court in McArthur, wherein that court noted that “[m]inor inconsistencies between appellant’s statements and acts at the scene of the death and the proof relied upon by the state to evidence appellant’s guilt create ambiguities in the tenor of proof, at best.” 351 So.2d at 976 n. 14.
The state’s brief discusses extensively the evidence of the Lords’ poor financial condition and the large amount of insurance available to Appellant should Mr. Lord die, arguing that this evidence proves a motive for the killing. While I question the probative value of this evidence, I find it unnecessary to discuss whether this evidence was sufficient to establish that Appellant had actual knowledge the policy had been issued before the occurrence of this shooting because proof of motive cannot cure deficiencies in the state’s proof of the essential elements of the charged offense. Motive is not an essential element of the crime charged, and proof of motive does not establish that the defendant committed the offense. See generally Wilkes v. State, 541 So.2d 664, 665 (Fla. 5th DCA), rev. denied, 547 So.2d 1211 (Fla.1989).
In summary, the state’s evidence failed to exclude every reasonable hypothesis of innocence because it was based on an impermissible pyramiding of inferences. As we said in Weeks, when applying the rule against pyramiding inferences and holding that such evidence does not carry the state’s burden of excluding every reasonable hypothesis of innocence:
We, therefore, have no occasion to address the current debate over the proper roles of the trial judges and juries, respectively, in situations where the evidence is susceptible of both reasonable hypotheses of guilt and reasonable hypotheses of innocence.
492 So.2d at 722. Because, the state’s evidence violates the rule prohibiting the pyramiding of inferences and is not inconsistent with Appellant’s hypothesis of innocence that her husband died as the result of an accidental shooting, Appellant’s conviction of first degree premeditated murder should be reversed and this cause should be remanded with directions to discharge her of this offense. McArthur v. Nourse, 369 So.2d 578 (Fla.1979); Weeks v. State, 492 So.2d 719.

. It is undisputed that Mr. Lord was in fact 6 feet tall.

. On cross-examination, Williams explained that he meant "[p]ushing it with this finger, your thumb, or little finger, or any other part of the body, or a stick or anything as long as you put five and a half pounds of pressure on it, that trigger is going to give way.”

. Careful examination of the record has revealed no proof that the pillow shown in the photographs at Mr. Lord’s back was in that position when the shot was fired, as Williams has assumed for purposes of his opinion testimony. The record shows only that the pillow apparently was in this position when the authorities began their investigation after the bed covers had been moved from Mr. Lord's back. No one testified to any facts showing that the pillow was in this position when the gun fired and that it had not been moved to this position after the shooting.

. Appellant so moved, but the motion was denied. Appellant renewed the motion at the close of all evidence, and it was again denied.

. Appellant presented expert testimony that after the shooting she was suffering from amnesia as a result of this incident and that this condition prevented her from having full and accurate recall of the events at the time of the shooting. The state presented no expert who could say that Appellant was not suffering from amnesia, as she contended. The state’s expert on this issue also was called by the defense and testified that he could say neither that she suffered from amnesia nor that she did not suffer from it.